## IN THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA,

AT THE SPECIAL TERM THEREOF HELD AT WHEELING, IN THE COUNTY
OF OHIO, COMMENCING ON THE 2D DAY OF MARCH, 1881, AND
ENDING ON THE 31ST DAY OF MAY, 1881.*

## Wheeling.

### VINAL v. CORE AND COMPTON.

#### Decided May 14, 1881.

(Absent, JOHNSON, JUDGE.)

1. In an action for malicious prosecution against two defendants jointly, the cause of action arose in Ritchie county, West Virginia. One of the defendants resided in that county; and the other defendant resided in the State of Michigan, and had not any estate or debts due him in Wood county, West Virginia. The circuit court of Wood county has, nevertheless, jurisdiction of the action, if the defendants were found in that county and served with process in it; and a plea in abatement setting up in a proper manner these facts was properly held bad on demurrer.

2. When the declaration alleges the discharge of the plaintiff by the examining justice the following facts must be proved in such a case to justify a verdict against both of the defendants jointly: First, That the prosecution alleged in the declaration had been set on foot and conducted to its termination in the final discharge of the plaintiff by the jus-

*The other cases determined at this Term were reported in Volume XVII.

| | |
|---|---|
| 18 | 1 |
| 34 | 279 |
| 18 | 1 |
| 38 | 722 |
| 18 | 1 |
| 40 | 262 |
| 40 | 292 |
| 18 | 1 |
| 41 | 120 |
| 18 | 1 |
| 46 | 372 |
| 18 | 1 |
| 47 | 728 |
| 18 | 1 |
| 48 | 25 |
| 18 | 1 |
| 49 | 664 |
| 50 | 590 |
| 18 | 1 |
| 51 | 164 |
| 18 | 1 |
| 53 | 123 |
| 18 | 1 |
| 61 | 250 |
| 18 | 1 |
| m64 | 318 |
| 64 | 322 |

tice; Second, That it was instigated and procured by the co-operation of the defendants; Third, That it was without probable cause; Fourth, That it was malicious.

3. By the first of these requirements is meant that the plaintiff must have been arrested under a process not absolutely void; and by its being ended is meant, not that the plaintiff had been so discharged, as that no subsequent prosecution for the same alleged crime could ever be instituted, but only that this particular prosecution was ended, when this was the allegation in the declaration.

4. By the second of these requirements is meant, not that the defendants jointly applied to the justice to issue the warrant against the plaintiff, but that they consulted and advised together, and both participated in the prosecution, which was carried on under their countenance and approval.

5. By the third of these requirements, probable cause, is meant, a state of facts actually existing known to the prosecutor personally or by information derived from others, which would justify the prosecution, that is, which in the judgment of the court would lead a reasonable man of ordinary caution, acting conscientiously upon these facts, to believe the party guilty.

6. By the last requisite, malice, is meant, not what this word imports, when used in common conversation, nor yet its classical meaning, but its legal and technical meaning, that is, some motive other than a desire to secure the punishment of a person believed by the prosecutor to be guilty of the crime charged, such as malignity, or a desire to get possession by such means of the goods alleged to be stolen, when the charge is larceny, or any other sinister or improper motive.

7. Whether malice exists or not is a pure question of fact for the jury, and should not be passed upon by the court, except to define to the jury clearly what is meant by malice. Whether particular facts admitted, undisputed or assumed, do or do not constitute malice, or are such, that malice may be inferred from, is a mere question of fact for the jury. The court can draw no inference from any state of facts, that malice does or does not exist.

8. On the other hand probable cause is a mixed question of law and fact. What are the existing facts, on which probable cause or its absence is based, is a question of fact to be decided by the jury. But the facts being admitted undisputed or assumed, whether they constitute probable cause or not, or whether from them the existence or absence of probable cause is to be inferred, is a pure question of law for the decision of the court and not for the jury.

9. Upon a supposed or assumed state of facts, no matter however complicated, if there be testimony tending to prove such facts, and they are pertinent to the question, the court is bound at the instance of the parties to instruct the jury, whether such supposed or assumed state of facts does or does not amount to probable cause.

10. An inference of fact may be drawn by the jury from a want of probable cause, that malice exists, but such inference cannot be drawn by the court, and is not a necessary inference in every case, and may be rebutted.

11. Want of probable cause cannot be inferred from the most express proof of malice.

12. There must always be proof of a want of probable cause to sustain the plaintiff's action; and in addition thereto he must satisfy the jury, that there is malice, though they may, if they think proper, infer this malice in a particular cause from the proof of want of probable cause; but malice and want of probable cause must both concur to entitle the plaintiff to recover.

13. Though the facts, on which are based the existence or non-existence of probable cause, are those known to the defendant, when the prosecution was begun by him, yet he may be presumed by the jury to know all the existing facts, and the burden is on him to satisfy the jury, that any particular fact proven to be then existing was unknown to him.

14. The opinions, beliefs and motives of the defendant form no part of the basis of probable cause, and are not to be considered in determining, whether probable cause exists or not.

15. The burden of proving the want of probable cause is in the first place on the plaintiff, but it being a negative proposition and sometimes for that reason difficult to prove, in such case but little is required to prove it.

16. The discharge by a justice of the plaintiff, who has been arrested and brought before him for examination, or the refusal of the grand jury to indict him, is *prima facie* evidence of a want of probable cause, but it is liable to be rebutted by proof.

17. In an action for a malicious prosecution for a crime alleged to have been committed by the plaintiff the measure of damages is such an amount, as the jury may find will compensate the plaintiff for the actual outlay and expenses about his defence in the prosecution against him, and for his loss of time, and for the injury to his feelings, person and character by his detention in custody and prosecution; and the jury may also, if they find said prosecution to have been commenced or pursued for private ends or with reckless disregard of the rights of the plaintiff, give such punitive damages as they may think proper, for such conduct on the part of the defendants.

18. In an action for malicious prosecution against two jointly they are both responsible to the full extent of the damages, which the plaintiff is entitled to recover against either, though one may have been actuated by malignity and the other by no malice except such as was inferrible from his uniting with his co-defendant in doing a wrongful act.

19. The plaintiff's general bad character may be proven in such an action in mitigation of damages; and it also enters as a fact or circumstance to be considered in determining, whether there was or was not probable cause.

20. If the plaintiff, though there was no probable cause for charging him with larceny, was nevertheless guilty of a gross fraud in appropriating the property of another to his own use, which property was in his custody, but to which he neither had a just claim nor believed he had a claim, such fraud should be considered as mitigating the damages, to which he may be entitled in an action for maliciously prosecuting him for stealing such property, and would render it improper for the jury in such a case to award him punitive damages.

21. The advice of counsel to the defendant to institute the criminal proceedings ought not to be taken into consideration in determining, whether probable cause existed or not. It should however be considered by the jury in determining the question of fact, whether the defendant was or was not actuated by malice, and it is entitled to more or less weight, or to no weight at all according to all the circumstances attending it, all of which should be considered by the jury. The circumstances referred to are such as these: Whether the advice of counsel was sought *bona fide* or was sought only as a mode of protecting the defendants in a contemplated wrong;—whether it was followed in good faith or not;—whether it was really believed to be good counsel by the defendant;—whether the attorney giving the advice was an attorney of character and standing or otherwise;—whether he was or was not candid and disinterested in the opinion of the defendant in giving the advice;—whether all the facts and circumstances as known to the defendant were frankly communicated to the attorney, or a portion of them suppressed or misstated;—whether the defendant had or had not made a careful investigation of the facts before consulting counsel. Under some circumstances this advice of counsel ought to be entitled to great weight with the jury as tending to show, that the defendant was not actuated by legal malice; under other circumstances it would be entitled to very little or no weight, or might even tend to show, that the defendant was actuated by malice. The jury alone should determine the character and effect of such advice.

22. A new trial in cases of this character ought not to be granted especially by the Appellate Court, because the damages awarded are excessive, unless they are so enormous as to furnish evidence of prejudice, partiality, passion or corruption on the part of the jury.

23. In such cases and in all cases, where the proper amount of damages can not be fixed by the court by the application of settled rules of law to evidence, but where it necessarily depends in a great degree on the discretion of the jury, if the damages assessed are so enormous as to justify the court in setting aside the verdict and awarding a new trial, this should be done, and the court ought not to refuse to set it aside in such a case, if the plaintiff will remit a certain portion of the damages, and declare, that otherwise a new trial will be awarded, thus substituting his judgment for that of a jury. If this be done, and the plaintiff does so remit a part

of his damages, he cannot complain; but if the Appellate Court deems the damages awarded by the jury so enormous as to justify the setting aside of the verdict on a writ of error prosecuted by the defendant, such a judgment of the circuit court would be reversed, otherwise it would not.

24. In this case it appears by the evidence now in the case, that the plaintiff was arrested by the procurement of the defendants on a charge of larceny of certain oil; that when he was alleged to have stolen this oil, he was in the possession thereof as a tenant of oil-wells, it being oil which he had himself produced;—that he was bound to deliver, whenever called on, one third of the oil he produced as rent to his landlord; and that he by his contract was forbidden to remove any oil from the premises without notice to his landlord; that without such notice he did remove all the oil, which at a particular time he had on the premises, and appropriated it to his own use, claiming that there was no rent-oil then due to his landlord, because more oil had been taken as rent on a previous occasion by the landlord, than he was entitled to; and that this had been taken in the absence of the plaintiff. These facts and this claim of the plaintiff was known to the prosecutors, the defendants; nevertheless, they had him arrested on a charge of stealing the rent-oil claimed to be due and taken off under these circumstances, and appropriated by the plaintiff to his own use. HELD :

That there was no probable cause to justify the defendants in procuring this prosecution to be set on foot.

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Wood, rendered on the 19th day of April, 1879, in an action in said court then pending, wherein John F. Vinal was plaintiff and Andrew S. Core and Benjamin S. Compton were defendants, allowed upon the petition of said defendants.

Hon. J. M. Jackson, judge of the fifth judicial circuit, rendered the judgment complained of.

GREEN, JUDGE, furnishes the following statement of the case :

In August, 1876, John F. Vinal filed his declaration in the circuit court of Wood county against A. S. Core and B. S. Compton for a malicious prosecution. The writ was served on both the defendants in Wood county, and on the return day of the writ the declaration was filed, and the defendant, Andrew S. Core, appeared and filed a plea in abatement, alleging that at the time of the commencement of said action or before or since he was not and has not been a resident of said

county of Wood, but was at that time and has been ever since and is now a resident of Ritchie county, in the State of West Virginia, and that the cause of action or any part thereof did not arise in said county of Wood, but arose in said county of Ritchie. At the same time another plea in abatement was filed by the defendants, Core and Compton, alleging the same facts and further, that at the time of the commencement of the suit or before or since Benjamin S. Compton was not and has not been a resident of said county of Wood, but was at that time and has ever since been and is now a resident of the State of Michigan, and that said Compton had not at that time or since or now any estate or debts due him in said county of Wood. To these pleas the plaintiff demurred and the court sustained the demurrer. The defendants then pleaded not guilty, and issue was joined thereon.

The first count in the declaration alleged, that on May 5, 1876, the defendants maliciously appeared before a certain justice of the peace of Ritchie county and falsely, maliciously and without any probable cause charged the plaintiff with having feloniously stolen, taken and carried away on April 29, 1876, in said county of Ritchie forty-one barrels and thirty-seven gallons of oil of the value of $150.00 of the goods and chattels of said Core, and upon such charge the defendants falsely, maliciously and without any probable cause caused and procured the said justice to make his warrant to apprehend the plaintiff, and on the 9th of May, 1876, they wrongfully and without any probable cause procured the plaintiff to be arrested and detained for two days and carried before said justice to be examined, who detained him further for two days, and on May 10, 1876, adjudged and determined after examination of the case, that the plaintiff was not guilty of the said supposed offence, that there was not sufficient cause for charging the plaintiff with said offence, and then and there caused the said plaintiff to be discharged out of custody and fully acquitted and discharged of said offence; and that the defendants had not further prosecuted their charge and complaint, but have abandoned the same, and it is wholly ended.

The second count charged, that the defendants combined and confederated together and falsely and maliciously procured the plaintiff to be arrested and imprisoned and to be examined

by a certain justice of the peace of Ritchie county on a charge made by them of grand larceny, of which the plaintiff after examination was fully discharged and acquitted; and that they had not since prosecuted the same, but have abandoned it, and it is wholly ended.

The declaration concludes by alleging, that the plaintiff had expended a large sum of money, to wit, $1,000.00 in his defence and lays his damages at $20,000.00.   The declaration appears to be formally drawn and was not demurred to by the defendants.

On March 27, 1879, the jury found a verdict for the plaintiff and assessed his damages at $10,000.00.  The defendants moved the court to set aside this verdict and grant them a new trial, on the ground that the verdict was contrary to the law and evidence; and on another day of the term, April 19, 1879, the court overruled the motion so. far as based on the first ground, and as to the second ground, that the damages found by the verdict are excessive, the plaintiff in open court elected to release to the defendants $5,000.00, one half of the damages, and thereupon the court overruled said motion upon the second ground, and the court rendered a judgment for the plaintiff against the defendants for this $5,000.00 with interest from April 19, 1879, and his costs.

Three bills of exceptions were taken by the defendants, which set forth all the evidence given at the trial.   The first bill of exceptions states all the evidence given by the plaintiff in chief.   The justice referred to in the declaration testified, that on May 5, 1876, the defendant, Core, made and signed an affidavit before him, which was drawn up when he came before him, and which set out, that on April 29, 1876, the plaintiff, Vinal, did feloniously take, steal and carry away forty-one barrels and thirty-seven gallons of oil of the value of $150.00 of the goods and chattels of the affiant and asked, that he might be apprehended and held to answer his complaint and be dealt with in relation thereto, as the law might require; and thereupon he issued the warrant for his arrest commanding him to be forthwith apprehended and brought before him, the justice, to be further dealt with according to law; and he at the same time ordered five witnesses to be

summoned for the State. This warrant was placed in the hands of a constable.

When Core swore to this affidavit, which is a positive statement, he said, that the statement in it was information and hearsay, but he believed it. No one else was present but his counsel, who was the prosecuting attorney of Ritchie county.

The constable under this warrant arrested Vinal, the plaintiff, and brought him before this justice. He, the justice, examined the case, the investigation lasting two days; and he dismissed the charge. The constable testified, that he arrested Vinal under this warrant at his house and took him to Harrisville.

Vinal, the plaintiff, testified, that he was arrested on Saturday at nine o'clock A. M. at his house near Petroleum. He told the constable, that he wanted to go to Parkersburg to employ counsel, and the constable replied, that if he would give him his word of honor, that he would return, he might go. He went and returned with his witnesses on Tuesday following May 9, when the constable took him before the justice. The examination commenced about one o'clock P. M., continued till dark was renewed the next day and continued till quarter past three, when the warrant was dismissed, and he discharged by the justice. He had lived near Petroleum for thirteen years, was before a resident of Wood county. His witnesses' fees on this examination were $56.00; his attorney's fee $25.00; and the time he lost was worth $25.00. He paid the fare and hotel-bills of his witnesses. He had been tenant of the West Virginia Oil and Oil Land Co., since April, 1872. Had theretofore had business transactions with Compton but none with Core. On the night after the close of the trial Core said to him: "I suppose you will make us pay for this, Colonel." The defendant, Compton, was the general manager at the trial. He said that he had a right to consult and direct the lawyers, as they were his lawyers. There were three lawyers aiding in the prosecution. Core and Compton, the defendants, consulted together and with these lawyers. He paid out in this matter about $150.00. On Saturday he was with the constable about an hour.

A witness, Coville, testified, that he was a witness for Vinal, the plaintiff, at that examination. The witnesses were exam-

ined separately and apart. In the fall of 1876 the defendant, Core, pointed out Vinal to the witness and said: "There's a man Colonel Compton has persuaded me to persecute;" and within four months preceding the time, when the present case was tried, the defendant, Core, said to the witness at Hill's hotel in Parkersburg, that he was persuaded into this thing; that his counsel had advised him to do it as the only means to protect himself; that he was averse to it.

The counsel for the plaintiff, Vinal, at this examination made the same statements substantially as Vinal as to what took place at the examination before the justice; and he confirmed Vinal's statement, that the defendant, Compton, took an active part in the prosecution, asking some questions himself of witnesses.

This was all the plaintiff's evidence in chief. When he announced, that he was through his evidence, the defendants moved the court to exclude all the plaintiff's evidence from the jury, on the ground that it showed no cause of action against the defendants or either of them. The court overruled this motion; and the defendants excepted to this action of the court.

The defendants then introduced their evidence, and the plaintiff his rebutting evidence, all of which with the plaintiff's evidence in chief is set forth in the other two exceptions taken by the defendants. This evidence is unsatisfactory and indefinite in some respects and is contradictory in others. It appears from it, that the plaintiff, Vinal, was a tenant of the West Virginia Oil and Oil Land Company, who owned oil-lands in this State worth between $200,000.00 and $300,000.00. The defendant, Compton, who lived in Michigan, was the president of this company and owned more than half the stock of the company, and was a wealthy man. Vinal had leased certain of the lands of this company in Ritchie county, in which several oil-wells had been sunk; he had been working them for several years prior to 1875. By his contract with or lease from this company Vinal like other tenants of the company was to pay one third of the oil produced by him to the company. This oil was to be delivered as rent or royalty from time to time, whenever the company chose to demand it; till delivered all the oil remained in the possession of Vinal or

the tenant, whoever he might be ; and Vinal or the tenant, whoever he might be, had no right under the contracts to remove any of the oil without giving the company notice. The company of course had no right to remove any oil without the consent of Vinal.

Some of the witnesses say, that while the oil remained in the tank where first pumped, and before it was divided, the tenant, whoever he might be, or Vinal, was a tenant in common with the company, Vinal or the tenant owning two undivided thirds and the company one undivided third. As the oil until divided was in the possession of the tenant or of Vinal, it is immaterial, so far as the rights of parties in the present suit are concerned, whether all the oil before its division belonged to the tenant or Vinal with a mere obligation on him to deliver up one third on demand, or whether the tenant or Vinal was a tenant in common with the company, the possession of their common property being with the tenant or Vinal till the division. The exact nature of this possession could only be shown by the production of the contract between them or the lease, and this, though doubtless accessible to both, was not produced in evidence before the jury.

This tenancy of Vinal had lasted several years, when on January 20, 1875, this company by its agents, of whom the defendant, Compton, was one, made a written contract with one Backus, which among other things transferred to him the royalty-oil which was due or might become due from certain tenants of the company in Ritchie county including the plaintiff, Vinal, from January 1, 1875, for the term of three years thereafter. On the 1st of May, 1875, Backus made an assignment of an undivided three fourths part of the entire property so leased by him including three fourths of this royalty of the plaintiff, Vinal, for a certain period to Hoftmire & Co. This assignment was not produced in evidence before the jury, though the record would indicate, that it was in the power of either of the parties to this suit to produce it, had they chosen so to do. There is from the loose testimony given in this case, as we will presently see, much difficulty in determining certainly from what time and to what

time this three-fourths of royalty of Vinal and other property was by this assignment transferred to Hoffmire & Co.

On August 17, 1875, the said Backus assigned to Silliman the remaining one fourth in said lease and contract by said company to Backus, including the one fourth of the royalty of the plaintiff, Vinal, to take effect from the 1st day of May, 1875, and to continue in force till the 1st day of May, 1876.

A general notice of these transfers was given by Backus to Vinal on December 17, 1875 ; and on December 23 he gave him a more specific notice thereof. In this last notice he says: "By my assignment to Hoffmire & Co. I transferred the right to three fourths of your royalty to them for and during the first year of my lease from the West Virginia Oil and Oil Land Company and no longer, and such first year terminates January 1, 1876." But four months before this notice was given to Vinal, the plaintiff, on the 16th day of August, 1875, the West Virginia Oil and Oil Land Company in the absence of Vinal and without his consent had taken from his oil-tank one hundred and twenty-nine barrels and twenty-seven gallons of oil as the royalty due them from October 22, 1874, to May 1, 1875. The party who for this company so took this oil from this tank says: "It was taken as royalty due to May 1, 1875, so as to draw the hire to the commencement of Hoffmire & Co.'s time." Backus, it appears, in some way authorized this company to take all the royalty he was entitled to under his contracts with the company, which was not assigned to Silliman or to Hoffmire & Co.

It would seem from this, that at that time, August 16, 1875, when this one hundred and twenty-nine barrels and twenty-seven gallons was so taken from the plaintiff's, Vinal's, tank as royalty, to which the West Virginia Oil and Oil Land Company was entitled, it was considered, that the interest of Hoffmire & Co. in this royalty did not commence till May 1, 1875, the date of his contract, though from the notice given to Vinal December 25, 1875, it would seem, that Hoffmire & Co.'s interest amounting to three fourths of the royalty commenced on January 1, 1875. If this were really so, the West Virginia Oil and Oil Land Company took on the 16th of August all the

royalty, which arose from Vinal's wells from January 1, 1875, to May 1, 1875, including forty-seven barrels, which on this supposition did not belong to them, but belonged to Hoffmire & Co. This oil, it is admitted, was taken in the absence of Vinal and without his consent; but the party, who took it, says, it was taken with the knowledge and consent of Hoffmire & Co. and Backus, who told him to pump it to the West Virginia Oil and Oil Land Company. It is admitted by Backus, that he gave such direction, but he says, he did not hear Hoffmire & Co. give such direction. They did not testify in the case, but their subsequent conduct is inconsistent with their having turned over their royalty between January 1, 1875, and May 1, 1875, these forty-seven barrels of oil, to the West Virginia Oil and Oil Land Company; for on the 11th day of March, 1876, they executed to the plaintiff, Vinal, a receipt, which he produced at the trial, which was for $350.00 in full for royalty and expressly reciting, that "the royalty settled for in this receipt being three fourths of the royalty, which became due from said Vinal from the 1st day of January, 1875, to the 1st day of January, 1876." The receipt also of Silliman for $175.00 in full for his royalty from May 1, 1875, to May 1, 1876, was also produced. It was dated April 17, 1876.

Before the giving of this receipt by Hoffmire & Co. they, Backus, Compton, the defendant, and the West Virginia Oil and Oil Land Company acting by its president, the defendant Compton, personally had on February 11, 1876, entered into a contract and compromise, which recited that Hoffmire & Co. had pending in Ritchie county two suits against the other parties, and that the West Virginia Oil and Oil Land Company also had two suits pending in said county against the other parties, all of which it was proposed to settle. These four suits were then agreed to be dismissed and Hoffmire & Co. agreed to surrender to the West Virginia Oil and Oil Land Company possession of three fourths of the property as described in this lease or contract with Backus of date January 20, 1875, from the 1st day of January, 1876. This of course operated as a surrender of any claim of royalty against the plaintiff, Vinal, after January 1, 1876, if in point of fact Hoffmire & Co. ever had such claim under their assignment from

Backus.   Hoffmire & Co. on the one part and the West Virginia Oil and Oil Land Company on the other part by this compromise also mutually released each other from all demands up to that date.

It was also stipulated, that Hoffmire & Co. were to have till May 1, 1876, to receive and have shipped any oils they might have on said premises, which stipulation of course covered a right to receive and ship any royalty due from Vinal, the plaintiff, to them.   And Hoffmire & Co. covenanted, that they had a right to deliver possession of the premises after January 1, 1876, and that no person had a right under them to such property from January 1, 1876.  This of course amounted to a stipulation, that they had not transferred and would not transfer any claim of royalty against the plaintiff, Vinal, for any royalty accruing after January 1, 1876.   None of the provisions of this contract referred to could operate as a release of the plaintiff, Vinal, from any liability to Hoffmire & Co., if any such liability really existed, for royalty from January 1, 1875, to May 1, 1875, or operate as a transfer of such liability to the West Virginia Oil and Oil Land Co. From his receipt to Vinal produced at the trial dated March 11, 1876, it seems that they claimed, that such liability existed, and Vinal settled it with Hoffmire & Co.   Whether this was a rightful claim or not cannot from the evidence be determined, as the assignment to Vinal from Backus of May 1, 1875, was not offered in evidence at the trial, nor does the evidence show the character of the four suits, which were compromised and settled.

It is thus impossible with any certainty, to say whether on the 11th of March, 1876, when Vinal settled with Hoffmire & Co. for royalty from January 1, 1875, to May 1, 1875, they had any right to demand this of him; or whether, if they had such right at one time, they may not have surrendered it by the dismissal of said suits.   This might possibly have been the effect of the compromise of February 7, 1876; but if it had such effect, it does not appear from the evidence submitted to the jury.

A few days after this compromise of February 11, 1876, the West Virginia Oil and Oil Land Company, by Compton, the defendant, transferred to the defendant, Core, three

thousand barrels of oil to be by him sold and the proceeds paid to certain parties, among whom was their attorney Coleman, $500.00, Gilman, a witness hereafter mentioned, $250.00, Core, the defendant, $3,000.00, and the son-in-law of Core for legal services $400.00. This assignment was intended to cover oils then in the possession of the grantors and also oils, which might become due to them afterwards for royalty including any royalty that had or might be due to them from plaintiff, Vinal, though the assignment mentioned no oil in particular, only specifying three thousand barrels, as if it were then owned by them at that time.

Core testifies, that he directed Gilman to demand this royalty-oil from the plaintiff, Vinal, he Core, claiming three fourths of the royalty from Vinal due for oil produced by him from January 1, 1876. It was reported to him, he says, that Vinal, the plaintiff, said he, Core, as assignee of the West Virginia Oil and Oil Land Company had no royalty-oil due from him, Vinal, and that he refused to let him have any. He says, he again sent this agent back to Vinal, and he reported to him, that Vinal again refused to let him have any oil; that he afterwards learned from the pumper, that all the oil had been removed by the plaintiff, Vinal, on Saturday night and Sunday, April 29 and 30, 1876. The defendant, Core, further states, that he thereupon called upon the defendant, Compton; said Coleman, the counsel of the West Virginia Oil and Oil Land Company, was present. The object was to get possession of the oil. It was the opinion of Coleman and of the defendant, Compton, that the way to get the oil was to issue a criminal warrant against the plaintiff, Vinal. The defendant, Core, was unwilling to take this course and he and Compton went to Harrisville to see on the subject Core's son-in-law, who had been many years a lawyer and was the prosecuting attorney of the county. Both Compton and this attorney advised the prosecution. He says, he knew Silliman claimed a fourth of this royalty. He says, he knew Hoffmire & Co. did not claim the balance, and that the royalty after January 1, 1876, belonged to the West Virginia Oil and Oil Land Company. Compton said, he was satisfied, that Vinal was taking the oil and would keep it, that he had no confidence in him. The affidavit, on which the warrant was based, was drawn by

his son-in-law, and he, Core, swore to it.   It states the fact
positively, that John F. Vinal did feloniously take, steal and
carry away forty-one barrels and thirty-seven gallons of oil
of the goods and chattels of Core.   He states however, that
he told the justice, that he had not personal knowledge of the
facts, but only information, which he believed.  He states,
that Compton took part in the prosecution in the examination
before the justice.

Gilman testifies, that he called on Vinal twice about getting
from him this royalty-oil for Core: once on February 11, 1876,
and once on April 27, 1876; and he always had some excuse
for not delivering the royalty-oil.   At one time he said, it
was not in condition to ship; there was water in it.   On the
last occasion he promised to deliver the oil the next day, Fri-
day, the 28th of April.   I was not there that day, but I
directed the pumper to remove the oil on Friday.   He was
running the tubing lines for the company.   All this is posi-
tively denied by Vinal and is in effect denied by Core, who
admits, that he understood, that Vinal refused to deliver any
oil to him or to the company and said, he had no royalty-oil,
to which they were entitled.   In point of fact they were en-
titled to some forty-two barrels of royalty-oil in Vinal's pos-
session, unless, when they drew the royalty from January 1,
1875, to May, 1, 1875, some forty-seven barrels, they drew
what they had no right to, but which belonged to Hoffmire
& Co.   If they overdrew this forty-seven barrels, they had
no royalty due from Vinal, nor had their assignee, Core.
Vinal had on March 11th paid Hoffmire & Co. for this forty-
seven barrels as royalty-oil belonging to them, it being in-
cluded in the settlement of March 11, 1876.

The facts with reference to the removal of the oil are these :
Vinal had denied, that there was any oil due to Core as as-
signee of the company or to the company and claimed, that
the royalty on hand claimed by them belonged to Hoffmire &
Co., the company having overdrawn that much and more than
that much, which belonged to Hoffmire & Co.   The use of
the tubing line, by which the oil was run off, belonged for
one fourth of the time to one Caskins and for the balance of
the time to the West Virginia Oil and Oil Land Company.
The time when Caskins had the use of the line expired on

Sunday the 30th day of May, 1876. After that the company had the exclusive use of the line. This was I suppose the reason why this oil claimed by Vinal was run off on Saturday evening and Sunday in these tubes. The oil was all in Vinal's tank; but the understanding was, that neither Vinal nor any other tenant of the company should take or run off any oil without giving the company notice, that the oil might be measured and the royalty ascertained. An arrangement was made Saturday morning, April 29, for one Williams to notify Upton, the agent of the company, that Vinal intended to remove this oil; but no such notice was in fact given. Before the oil was run off, it was all measured by Caskins. It was run from the plaintiff's, Vinal's, tank into a tank of the West Virginia Transportation Company, a distance of from a half to three fourths of a mile. This oil, when so moved, was all in the tanks of Vinal, by whom it had been produced, no part of it had been divided or assigned to any one as royalty, this was well known to the defendants, Compton and Core. The running of it off commenced on Saturday evening the 24th of April, 1876, and continued all night and a part of Sunday. This moving of the oil was not done clandestinely. The very next day after its removal Caskins, who ran it off in the tubes for Vinal, notified the proper agent of the West Virginia Oil and Oil Land Company of this removal and of the exact quantity, that was removed, and when it was removed There was no secrecy about it.

At the examination before the justice a question arose, whether any of this oil belonged to Core as assignee of the West Virginia Oil and Oil Land Company, or whether the royalty then in the tanks of Vinal did not belong to Hoffmire & Co. On this point Vinal testifies: "My attorney said: 'Gentlemen' (speaking to Compton and his attorneys) 'do you admit, that the assignment of the Backus lease to Hoffmire & Co. transferred the royalty due from Vinal's works from January 1, 1875, to January 1, 1876, to Hoffmire & Co. three fourths, and one fourth to Silliman from May 1, 1875, to May 1, 1876, or shall I go below and get the answer of the company in the Hoffmire case?'" (I presume this referred to one of the suits before spoken of which had been compromised). "They consulted together across the table and then

Compton nodded his head. and said in a whisper 'yes, that's right' and then one of his counsel, the son-in-law of defendant, Core, said: 'Yes, that's admitted;' then the witness Caskins, who was being examined, said: 'there is no royalty due the company.' He would not say that any other of the counsel made such admission audibly, but there seemed to be a general concurrence in it."

On this subject Caskins, a defendant's witness, testifies, that "The justice called upon me to state about the royalty, and I told them it went direct to whom it belonged. Some one answered 'Concede that to Hoffmire & Co.,' but I do not know by whom this answer was made. The justice then dismissed the warrant. I do not know that Core was present when that admission was made. The admission was not denied. It was all done in about ten minutes."

One of the defendant's counsel testified, that "the justice asked, whether Hoffmire & Co. were entitled to the royalty, and some one, he believed it was Vinal, spoke up and said, they were; and immediately upon that statement being made, the justice said: 'Then I dismiss the warrant.'"

Another of the counsel says he does not recollect any such admission being made. The third counsel for the defendants, who, it was said, made the admission, was examined, but he says nothing on this subject.

The constable testified, that since the commencement of the court Gilman, who had long been in the employment of the company, said, the reason they got defeated at Harrisville was, because of the admission of that damned fool, that the royalty belonged to Hoffmire & Co. Gilman denied that there was a word of truth in this.

In reference to whether this royalty from January 1, 1875, to May 5, 1875, belonged to Hoffmire & Co., Vinal also testified, that in February, 1877, he, Compton, told him he did not know about Hoffmire & Co. He, Vinal, advised him to bring suit, and if the jury was sworn and found for him, he, Vinal, would turn the oil over. Suit was brought, but not as Vinal had suggested. Compton denies, that this conversation was about this royalty in dispute. It was about other royalty, and the royalty, which they were then talking about, he, Compton, took by force. Compton admits, that there were

suits between Vinal and the West Virginia Oil and Oil Land Company, and that he was not friendly with him and had not been since 1872. Before the criminal warrant was issued against Vinal, he, Compton, had tried to have him indicted in the Federal court for perjury. And he also admits, that he employed counsel in the prosecution of the case against Vinal before the justice. He says: "My principal object in causing the arrest of Vinal was to obtain possession of the oil." The defendant Core says, this was his sole object. He was on friendly terms with Vinal.

All the evidence was certified by the court below; and the above is a substantial statement of it. After it was closed the defendant moved the court to give seven instructions, which will be given at length in the opinion. Of these six were granted by the court and the seventh refused. The plaintiff also asked six instructions, which will be hereinafter set forth at length, and the court granted them all.

The first bill of exceptions taken by the defendants was to the refusal of the court to exclude all the plaintiff's evidence, when he rested his case, on the ground that it showed no cause of action against the defendants or either of them. Their third bill of exceptions was to the refusal of the court to award them a new trial, all the evidence being certified in it by the court. Their second bill of exceptions was to the action of the court in granting the plaintiff's six instructions and in refusing to grant the defendants' seventh instruction.

This Court on June 13, 1879, awarded a writ of error and *supersedeas* to the judgment of the circuit court of Wood county, before stated, rendered the 19th day of April, 1879.

*A. I. Boreman* and *Walter S. Sands*, for plaintiffs in error, cited the following authorities: Code ch. 123, p. 594; 1 Hill. Torts 428; *Id.* 42; *Id.* 418; *Id.* 430; Hill. Rem. Torts 385; 23 Ill. 578; 25 Ill. 339.; 7 Tex. 603; 11 Iredell 233; 12 Conn. 218; 3 Blackf. 445; 5 Duer 304; 1 Sandf. 600; 24 Pick. 81; 10 N. Y. 236; 24 How. 544; 28 Gratt. 890; 98 U. S. 187; 10 Reporter 107; 1 Am. Lead. Cas. 255; 17 Wend. 224; 4 Wash. C. C. 79; 2 Add. Torts § 853 (note); 8 Cow. 141; 17 Md. 508; 6 Barb. 83; 1 Sneed 128; 6 M. & S. 32; 33 Me. 331; 4 W. & S. 201;

Field Dam. 698; 2 Clifford 108; 11 Wis. 407; 13 Tex. 508; 21 Tex. 483; 6 Cow. 628; 2 Wash. 50; 12 Pick. 199; 12 Johns. 234; 7 T. R. 657; 1 Hun 540.

*John A. Hutchinson* and *J. B. Jackson,* for defendant in error, cited the following authorities: 2 Pat. & H. 529; 2 Gratt. 202; 26 Gratt. 537; 1 Am. Lead. Cas. 215; 26 Ill. 259; 14 Shipley 266; 13 Ill. 701; 4 Am. R. 151; 24 How. 543; 15 Gratt. 381; Cooley Torts. 181, 182, 184; 2 Gratt. 18; 21 Gratt. 214; 17 Gratt. 427; Sedg. Dam. 707; Addison Torts 844; 2 H. & M. 600; 14 Wend. 192; 4 Munf. 462; 29 Gratt. 206; 6 Dow. & Ry. 12; 1 B. & Ad. 128; 18 Ill. 114; 2 Johns. 203; 3 Murph. 248; 52 Pa. St. 419; 1 Greenl. Ev. § 455; 3 Brev. 94; 1 Nott. & Mc. 278; 1 T. R. 493; 1 M. & W. 585; 6 Bing. 183; 62 Mo. 321; 17 Md. 508; 2 Stark. 389; 28 Gratt. 891; 62 Mo. 321; 37 Md. 369; 27 L. J. Exch. 57; *Id.* 134; 56 Mo. 89; 36 Cal. 462; 17 Mass. 186; 3 Rob. Pr. 123, 124; 33 Me. 580; 4 Dana 120; 6 Barb. 83; 13 Me. 439; 14 Wend. 192; 1 Barr 234; 3 B. Mon. 4, 6; 9 Barr 137; 5 Humph. 357, 359; 56 N. Y. 451; 83 Ill. 548; 4 Am. Rep. 157; 28 Gratt. 891; 29 Gratt. 206; 1 Am. Lead. Cas. 215.

GREEN, PRESIDENT, announced the opinion of the Court:

Before considering this case on its merits we must dispose of the preliminary question, whether the circuit court erred in overruling the demurrer to the pleas in abatement. The question presented by these pleas is: Did the circuit court of Wood county have jurisdiction to try this cause? The facts were as follows: The process in the case was issued by the clerk of the circuit court of Wood county and was served on both of the defendants in that county. One of these defendants resided in the county of Ritchie, and the other in the State of Michigan, and the cause of the action and every part thereof arose in the county of Ritchie.

These facts appear in the pleas, and the circuit court by sustaining the demurrer held, that these facts did not show, that the circuit court of Wood county did not have jurisdiction of the case. Was this decision right? There can be no question, that on the general principles of the common law upon this state of facts the circuit court of Wood county would

have jurisdiction to try this suit. By the common law all actions were either local or transitory. Real and mixed actions were local; personal actions were transitory. This is a personal action and therefore transitory. By the common law a transitory action, such as this, could be brought against a party, wherever he might be found and served with process; no matter where he might reside, or where the cause of action may have arisen. Both the defendants having been found in Wood county and served with process, it is clear upon common law principles the court had jurisdiction; and the only question is, whether this jurisdiction was taken away by chapter 123 of Code of West Virginia, page 594. This chapter is but a re-enactment of what had long been law in Virginia.

The general principles of the common law have been modified by the statute, which has created certain exceptions to it. These may be found in Rob. (new) Practice, vol. 1 pp. 353 to 357. But these exceptions do not touch the case before us. The only sections of this chapter of our code, which touch the matter before us, are the first paragraph of the first section, and the second section. This first paragraph of section first is: "Any action at law or suit in equity, except where it is otherwise specially provided, may be brought in the circuit court of any county, where any of the defendants may reside." This section does not restrict but enlarges the cases in which a circuit court may take jurisdiction. This suit for instance, might have been brought in the county of Ritchie, because one of the defendants resided there, even though neither of them was found there. And under section 2 of chapter 124, Code of West Virginia, page 595, the writ instituting the suit, had it been brought in Ritchie county, where one of the defendants resided, might have been sent to the sheriff of any county in the State for service on the other defendant. This section neither in terms nor by implication would prevent the suit from being instituted in any court, which by the rules of the common law would have jurisdiction of the case.

The second section of chapter 123 provides, that "an action may be brought in any county, wherein the cause of action or any part thereof arose, although none of the defendants may reside therein;" and said second section of chapter 124 provides, that "process against a defendant to answer in any

action brought under the second section of chapter 123 shall not be directed to any officer of any other county than that wherein the suit shall be brought." These two provisions of the law taken together amount to saying, that a defendant may be sued in a county, in which the cause of action or any part thereof arose, provided he can be found in the county and served with the process. But by the common law such a defendant, if he could be so found, could be sued not only in the county, where the cause of action arose, but in any county in the State. To give therefore any effect to this section it must be construed as authorizing the suit to be brought only in the county in which the contract was made, if the defendant could be found there, or in the county, in which one of the defendants resided. So construed it operates as an important modification of the common law rule, when the suit is to be brought against a defendant or defendants, who reside in this State. Such a defendant or defendants could not be served in any county, in which he or they might be found, but only in the county, in which one of the defendants resided, or in the county, in which the cause of action or some part thereof arose, provided the defendants were found in the county. But if the suit be against a single defendant, who is a non-resident of the State, and in case the contract was made out of the State, the statutes, we have referred to, would not modify the common law rule, that the defendant might be sued in any county, in which he might be found.

These statutes do not in their terms repeal the common law. on this subject, and in such a case they could not be fairly interpreted as repealing this common law rule by implication. If the defendant be within the State, so as to be served with process therein, he must in such case be liable to suit as at common law in the county, in which he may be found, and in which he is served with process, as at common law, or he would not be liable to suit in any court within the State. The object of these statutes was to give a more convenient and certain court, in which every resident of the State could be efficiently sued, and in such cases to impliedly forbid the suit to be brought, as by common law it might, in any county, in which the defendant might be found, and if not brought in the county, where one of the defendants resided, to permit it

to be brought only in the county, where the cause of action or a part of it arose, if the defendant could be found therein and served with process.

This object would not be effected, if the statute was interpreted to be an implied repeal of the common law rule, when the defendant was a non-resident. It was accordingly so held in *Bierne v. Rosser & Turner*, 26 Gratt. 541, 542, that this common law rule governed in the cause of a suit against a single defendant, when the contract, on which the suit was brought, was made out of the State. It seems to me .quite clear, that if the contract in such case had been made in the State, that would in no manner have altered the case; for though in that case there would have been a possibility of suing the non-resident under section 2 of ch. 123 in the county, where the contract was made, yet this would have been a mere possibility and would give no efficient suit, as the non-resident might never be found in such county.. The common law rule ought not to be regarded as repealed by implication, except when that statute gives a more efficient and certain suit in another court, as where one of the defendants resided.

This case differs somewhat from the case in 26 Gratt., as here were two defendants, one of whom resided in the State and might at any time have been sued under the statute in the county, where he resided, and the process might have been sent from this county to the sheriff of any other county to be served on the non-resident defendant, if he could be found in such other county. It is obvious however; that this, so far as the non-resident defendant is concerned, would be but a poor substitute for the common law rule, that he might be sued in any county in which he could be found. It is true, it is possible, that the suit being brought, where one of the defendants resided, the process might be served by the sheriff of some other county, to which it might be sent, if he could be found there, but in most cases, though he had been in such county temporarily, he would not be found there, after process was issued in a distant county and had been sent to such county. Such a substitute for the common law rule would hardly be more efficient than the right to sue a non-resident under section 2 of ch. 123 in the county, where the contract was made. In either case I cannot suppose, that the statute

intended to repeal the common law rule by implication. Such repeal by implication cannot be understood to exist, where a non-resident is sued, whether he be sued alone as in the case of *Bierne* v. *Rosser & Turner*, 26 Gratt. 541, or whether he be sued with another defendant, who is a resident of the State. In either case the common law rule not having been repealed expressly or by reasonable implication must still be regarded as in full force, and the defendants in a transitory action, such as this, are liable to suit in any county, in which they may be found and served with process. See also on this subject *Raine* v. *Rice*, 2 Pat. & H. 529; *Middleton* v. *Pinnell*, 2 Gratt. 202.

The circuit court therefore did not err in sustaining the demurrer to the pleas in abatement; and we must therefore consider the case on its merits.

To warrant any verdict of the jury or judgment of the court in favor of the plaintiff against the two defendants jointly in such a suit as this for a malicious prosecution against them, such as was rendered in the case, it must have been proved on the part of the plaintiff according to the decision in *Scott & Boyd* v. *Shelor*, 28 Grat. 899, in the words of Judge Burks slightly modified: "First, That the prosecution alleged in the declaration had been set on foot and conducted to its termination, and that it had ended in the final discharge of the plaintiff by the justice; Second, That it was instigated and procured by the co-operation of the defendants; Third, That it was without probable cause; Fourth, That it was malicious."

I will now consider the true legal meaning of these several requirements, and what evidence is necessary to establish each of these requisites, and then determine, whether such necessary evidence has been furnished in this case.

First, What is meant by saying, that the prosecution must have been set on foot and have been terminated? By a prosecution being set on foot is meant, that the plaintiff must have been arrested under a process not absolutely void. For if the process be absolutely void, no prosecution ever legally existed, and no suit for a malicious prosecution could be brought, but the the plaintiff's remedy would be by an action of trespassor case under our law. *Allen* v. *Greenlee*, 2 Devereaux 370; *Cockfield* v. *Braveboy*, 2 McMullan 270–273. But this action for malicious prosecution may be maintained, though the warrant or indict-

ment was legally defective, and the person never could have been convicted. *Jones* v. *Gwynn*, 10 Mod. 214–220. By saying that the prosecution must have terminated is meant, not that the plaintiff had been finally acquitted of the crime charged, unless the declaration had so alleged, but that the particular prosecution named in the declaration had finally terminated in the manner alleged in the declaration. The declaration to be good must allege the termination of the particular prosecution, but such termination need not be by a verdict of a jury and a judgment thereon, but may be, as in the case before us, a discharge by a justice, before whom the charge is prosecuted. On this point Chilton, J., in *Long* v. *Rogers*, 17 Ala. 546, says:

" But it is insisted, that the declaration is defective in not showing, that the prosecution is ended, and that the averment of the plaintiff's discharge before the magistrate is insufficient to warrant this action. It is certainly necessary for the declaration to show, that the prosecution is ended, (1 Chit. Pl. 679, *Id.* 123), and if it merely show, that the prosecutor caused the plaintiff to be released and set at liberty, and the said prosecutor wholly abandoned said prosecution, this is not sufficient, as was held in *Ragsdale* v. *Bowles*, 16 Ala. 62. It does not show, that the case or prosecution was ended, for the court or justice, before whom it was pending, might notwithstanding the prosecutor's unwillingness proceed upon the case, if he deemed the public interest required it. But such is not the case before us. Here the declaration avers a prosecution before a justice, an examination before him of the alleged cause of complaint, and the magistrate in the exercise of a rightful jurisdiction discharged the party. This ends that prosecution. The party, if improperly discharged, may be held to answer an indictment for the same offence, but this is a matter the defendant should avail himself of, and it is not incumbent on the plaintiff to aver, that no indictment was ever found upon the charge, or proceeding had thereon in any other court. We think a discharge by a justice of the peace upon an examination of the alleged causes of the plaintiff's arrest is altogether sufficient. Nothing further can be done with that prosecution. The party being discharged by the justice puts, as the books call it, *an end* to the prosecution.

This view is fully sustained by a very well considered case in the Supreme Court of New York, in which Cowen, Judge, says "the technical prerequisite is only, that the particular prosecution be disposed of in such a manner, that it cannot be revived, and the prosecutor must be put to a new one. *Clark* v. *Cleveland*, 6 Hill 344-7. The cases in the brief of the defendants' counsel sufficiently show, that this averment is sufficient. Besides there are several cases in our own court, where actions of the kind have been maintained, but the specific objection does not appear to have been directly presented. In *Collins* v. *Fowler*, 10 Ala. (N. S.) 858, a demurrer was interposed, but the court merely say, the points were not pressed at the bar, and required no consideration."

The second thing necessary to prove in such a case as the one before us is, " that the prosecution was instigated and procured by the co-operation of the defendants." By instigated and procured is meant instigation and procurement in the ordinary meaning of this language. It would not be necessary to show, that the defendants themselves either jointly or severally applied to the justice to issue the warrant. If they instigated and procured it to be done by another, they would be bound jointly, as much as if they had made a joint application to the justice to issue the warrant. Thus in *Scott & Boyd* v. *Shelor*, 28 Gratt. 891, the complaint was made by one Smith, and all his information was based on a letter written to him by one of the defendants, Scott; and Boyd, the other defendant, is only shown to have co-operated with him in procuring the prosecution of the plaintiff by his having told witnesses, that he, Boyd, would not have set the prosecution on foot, if the plaintiff had not abused the family of his father-in-law, Scott. The jury found a verdict against the defendants jointly, and the Court of Appeals refused to set it aside, saying they found no fault with the verdict.

We will now consider the fourth requisite for the plaintiff to prove in any suit for a malicious prosecution before considering the third of these requisites, as this order of considering them is in my judgment the manner, in which they can be best comprehended.

This fourth requisite is, that the plaintiff must prove, that the prosecution was malicious. The term malice as here used

does not necessarily mean, that which proceeds from a spiteful, malignant or revengeful spirit, but simply an improper spirit or purpose, which induces the performance of an act injurious to another without any just cause. It means however, that the spirit or motive, which operated on the defendant in stirring up the prosecution, was improper. And though the prosecution may have been instituted without justifiable or even probable cause, it does not necessarily follow, that it was instituted maliciously, that is, with a motive or object, which was not proper; for even where there is an absence of probable cause, the defendant may nevertheless prove, that the prosecution was set on foot by him from proper public motives only; and if he does so, this establishes the want of malice, though the absence of probable cause would justify the jury in inferring malice, if the circumstances of the case or the direct evidence did not satisfy the jury, that there was a want of malice, and that the prosecution was instituted only for proper public ends. In *Kerr* v. *Workman*, Addison (Pa.) 270, the court says:

" That in an action for malicious prosecution express malice is necessary to support it; but I apprehend the word *malice* has a technical meaning and is not to be considered as in common conversation or in a classical sense. Any prosecution carried on knowingly, wilfully and wantonly or obstinately for no purpose or end of justice, but merely to the vexation of the person prosecuted, I conceive to be malicious." See also *Cecil* v. *Clarke et al.*, 17 Md. 523, 524.

The court in *Scott & Boyd* v. *Shelor*, 28 Gratt. 909, says: " In a legal sense any unlawful act, which is done wilfully and purposely to the injury of another, is as against that person malicious. 1 Hilliard on Torts, ch. 16, § 24. The improper motive or want of proper motive inferrible from a wrongful act based on no reasonable grounds constitutes of itself all the malice deemed essential in law to the maintenance of the action of malicious prosecution. *Spengler* v. *Davy*, 15 Gratt. 381."

Tindal, Chief Justice, in *Stockley* v. *Hornidge*, 8 Carr. & Payne 11, 18, says: "It is not necessary to prove malice in the ordinary sense of the word. Any improper or sinister motive will be sufficient."

Burt, Chief Justice, in *Jones* v. *Nicholls*, 3 M. & P. 12, says : " Malice may be inferred ; malice in law means an act done wrongfully and without reasonable and probable cause, and not as in common parlance an act dictated by angry feelings or vindictive motive." And in *Page* v. *Cushing*, 38 Me. 526, the court-says : " Malice has a meaning different from its popular signification.   Acts wilfully and designedly done, which are unlawful, are malicious in respect to those, to whom they are injurious.   *   *   *   *   An act may be malicious in a legal sense, which is not prompted or characterized by malevolence or corrupt design."

Malice then may be defined as some motive other than a desire to have punished a person believed by the prosecutor to be guilty of the crime charged.   It is a sinister or improper motive and may be malignity or a desire by means of the prosecution to get possession of the goods alleged to be stolen or any other improper motive.   As therefore malice consists in some improper motive or the absence of a proper motive, it is obviously in all cases a question of fact for the jury ; and though there be no express evidence of malice, the jury can infer it from a want of probable cause alone.   Still this is an inference of fact and not of law, and it must therefore be drawn by the jury and can never be drawn by the court ; and being an inference of fact merely, it is of course not necessarily to be drawn and is liable to be rebutted.   See *Parrot* v. *Fishwick*, 9 East. 362 (note) ; *Musgrove* v. *Newell*, 1 Mee. & W. 582, 587; *Munns* v. *Dupont et al.*, 3 Wash. C. C. 32, 37 (Am. Lead. Cas. 5th ed., p. 274); *Pangburn* v. *Bull*, 1 Wend. 345 ; *Savage* v. *Brewer*, 16 Pick. 453; *Ulmer* v. *Leland*, 1 Greenl. 135, 137 ; *Turner* v. *Walker*, 3 Gill & Johns. 378 ; *Holburn* v. *Neal*, 4 Dana 120 ; *Holliday* v. *Sterling et al.*, 62 Mo. 321 ; *Cecil* v. *Clarke et al.*, 17 Md. 523.

But though want of probable cause is a ground, on which a jury is authorized to presume malice in the defendant, yet this may be rebutted by his proving to the satisfaction of the jury, that he was actuated by an honest motive and acted only from a mistaken sense of his public duty.   See *Bell* v. *Pearcy*, 5 Ired. L. 83-85 ; *Hall* v. *Hawkins*, 5 Humph. 357-359 ; *Fitzjohn* v. *Mackinder*, 99 E. C. L. 504.

The remaining requisite for the plaintiff to prove in every

action for a malicious prosecution is, that the prosecution was without probable cause. This is the very gist of such an action ; and it must therefore be proved by the plaintiff. We have seen, that malice may be inferred by the jury from the absence of probable cause; but it may be regarded as well settled, that want of probable cause can not be inferred from the most express proof of malice, and must be proven, though there be express malice. Thus in *Musgrove* v. *Newell,* 1 Mee. & W. 587-588, Lord Abinger says :

"To support an action of this kind there must be both malice in the defendant and a want of reasonable and probable cause. It is admitted, that even if there be excessive malice, if it be combined with probable cause, the action can not be supported. So also it is admitted, that a total want of probable cause is sufficient evidence, from which the jury may infer malice, inasmuch as in such a case the party would have no ground for proceeding in the charge but a malicious one. But on the other hand from any degree of malice you can not infer a want of probable cause ; that stands upon a class of facts to be looked at by themselves."

In this case there seems to me a clear separating of probable cause and the motives, that operate on the mind, that is, of probable cause and malice, which have very often been very improperly mingled in many decisions. See also *Pangburn* v. *Bull,* 1 Wend., 352 ; *Murray* v. *Long,* 1. Wend., 142 ; *Masten* v. *Deyo,* 2 Wend., 427 ; *Ulmer* v. *Leland,* 1 Greenleaf R., 137; *Israel* v. *Brooks,* 23 Ill., 576–577 ; *Marshall* v. *Maddock,* Litt. (Ky.) Sel. Cas., 107 ; *Williams* v. *Vanmeter,* 8 Mo., 342 ; *Chandler* v. *McPherson, et al.,* 11 Ala., 919 ; *Plummer* v. *Gheen,* 1 Hawks, 68–69 ; *Horn* v. *Boon,* 3 Strob., 809. These authorities and others establish the proposition, that probable cause can never be inferred from proof of the most express malice, but that both must co-exist, malice as well as probable cause, so that if in any case the defendant can prove, that the prosecution he instituted was based on probable cause, he is unquestionably entitled to go free of all liability therefor, he is justified in law, though the plaintiff establishes, that he is not guilty of the offence charged, and also that the defendant in causing him to be prosecuted was operated on by improper motives, or by excessive malignity and ill-will.

This doctrine is based on public policy, which requires, that prosecutions for offenses should not be discouraged, when there is probable cause to charge a particular party with the crime, "and those who feel some malignity or spleen against the accused are often the only persons, who will commence any prosecution." If facts exist, which render it probable, that a certain party has committed a crime, the public interest requires, that he should be prosecuted; and if it turns out, that he was innocent, he has suffered *damnum absque injuria,*even though the prosecutor was influenced by improper motives or malignant feelings. It is then of the first importance, that we have a clear and distinct idea of what is probable cause, the existence of which furnishes a perfect protection to any defendant in a suit for malicious prosecution, no matter how malignant he may have been in instituting the prosecution, and no matter how innocent the plaintiff may be of the offence charged. But unfortunately there has been a very great diversity of opinion, as found in the decisions, as to what is probable cause. It is thus defined in *Munns* v. *Dupont et al.,* 3 Wash. C. C., 41: " Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief, that the person accused is guilty of the offence with which he is charged." See same case Am. L. Cas. fifth ed., p. 254, side p. 204. This definition has frequently been used and applied. See *Spengler* v. *Davy,* 15 Gratt. 381-388; *Wilmarth* v. *Mountford,* 4 Wash. 82; *Foshay* v. *Fergusson,* 2 Denio 617-619; *Hall* v. *Suydam,* 6 Barb. 84-86; *Cabiness* v. *Martin,* 3 Dev. 454; *Raulston* v. *Jackson,* 1 Sneed 129.

In *Broad* v. *Ham,* 5 Bing., N. C. 722-25, Tindal, C. J., said: " There must be a reasonable cause, such as would operate on the mind of a discreet man; there must also be a probable cause, such as would operate on the mind of a reasonable man; at all events such as would operate on the mind of the party making the charge; otherwise there is no probable cause for him."

In *James* v. *Phelps,* 11 Ad. & E. 508, (39 Eng. Com. L. 153), Coldridge, judge, said that it had been decided in *Delegal* v. *Highly,* (32 Eng. Com. L. 398); 3 Bing. (N. C.) 950, that reasonable and probable cause must be that which existed

in the *mind of the prosecutor at the time.* See also *Branburry* v. *Cockfield,* 2 McMull. (S. C.) 270–274; and *Fitzgibbon* v. *Brown,* 43 Me. 174.

But where the prosecutor acts on the information of others, which turns out to be false or mistaken information, so that the cause may be said to exist only in the mind of the prosecutor, at the time he caused the prosecution to be set on foot, it has been held, that he was not liable in this action for malicious prosecution.

In many of the cases the ground of the decisions would seem to have been, that the facts proved rebutted the presumption of *malice,* and not that they showed a probable cause existing in the mind of the defendant. See *Cox* v. *Wirrell,* Cro. Jac. 193; *Snow* v. *Allen,* 1 Stark. 502 (2 E. C. L. 486). What was the true ground of such decisions is considered but not decided in *Sims* v. *McLendon,* 3 Strob. 560. In *Branburry* v. *Cockfield,* 2 McMull. (S. C.) 274, the court lay down this as the definition of probable cause : "Probable cause is anything, which will create in the mind of a reasonable man *the belief,* that a felony existed, and that the party charged was in any way concerned in it." In *Ulmer* v. *Leland,* 1 Greenl. 136, this definition is given by the court of probable cause : "Probable cause in general may be understood to be such conduct on the part of the accused, as may induce the court to infer, that the prosecution was undertaken from public motives." In *Bacon* v. *Towne et al.,* 4 Cush. 239, Shaw, Chief Justice, says : "Probable cause is such a state of facts in the mind of the prosecutor, as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion, that the person arrested is guilty." Again he says : "Probable cause does not depend on the actual state of the case in point of fact, but upon the honest and reasonable belief of the party commencing the prosecution. *James* v. *Phelps,* 11 Ad. & E. 483, 489." This view of the law was acted on in *Burlingame* v. *Burlingame,* 8 Cow. 141 ; in *French* v. *Smith et al.,* 4 Vt. 363, and by a majority of the court in *Scanlan* v. *Cowley,* 2 Hilt. 489.

But the contrary appears to have been the view of the court in *Jacks* v. *Stimpson,* 13 Ill. 703. A different view of the law was also taken in *Swaine* v. *Stafford,* 3 Ired. L. 289, where

the court decided : " In an action for malicious prosecution those facts and circumstances and those alone, which were known to the prosecutor, at the time he instituted the prosecution, are to be considered in determining, whether he had probable cause.   Any other facts, which may be established on the trial to prove the innocence of the person accused, are irrelevant to the question of probable cause."   See same case, 4 Ired. 392.

But in conflict with this is the case of *Seibert* v. *Price*, 5 Watts. & S. 438, where the court says : " Probable cause is a deceptive appearance of guilt arising from facts and circumstances misapprehended or misunderstood so far as to produce belief; and when the subject of belief is the crime of perjury the misapprehension may have regard to the extent of the swearing as well as the truth of it."   The court in that case regarded probable cause not as depending on actual facts, but on the defendant's belief in such facts.   Redfield, Judge, in *Barron* v. *Mason*, 31 Vt. 189, says : " Probable cause is not to be confounded with actual guilt.   Probable cause is only such a state of facts and circumstances, as would lead a careful and conscientious man to believe, that the plaintiff was guilty. This can only require, that the defendant upon prudent and careful enquiry shall find the reported or declared existence of such facts, as indicate guilt with reasonable certainty.   Mere general reputation will not alone constitute probable cause. For a prudent man in instituting an important criminal prosecution would ordinarily look further and enquire for testimony.   But in those courts, in which the prosecutor's belief in facts and not the facts themselves have been regarded as the grounds, on which probable cause is based, it is held, that this belief must not be occasioned by the prosecutor's own negligence or want of reflection or proper investigation.   See *Merriam* v. *Mitchell* 13 Me. 439; *Travis* v. *Smith*, 1 Barr 234, 237.

While thus some of the cases hold, that the grounds, on which probable cause is based, are not the actual facts of the case but the belief of the party instituting the prosecution, at least when such belief is induced after careful examination, in other cases it would appear, as if the court or judges deemed the proper basis, on which rests probable cause, is the actual facts and depends in no degree on the prosecutor's knowledge

or belief of the facts. Thus in *Mowry* v. *Miller*, 3 Leigh 566, President Tucker says: "The law requires the plaintiff in this action to set forth, that the *prosecution* was without *probable cause.* But as this is merely, because no man can maintain an action for a malicious prosecution, where there was probable cause, it is obvious that these words should be made to refer to the state of fact, as it respects the person prosecuted, and not to the degree of knowledge of the fact in the party prosecuting." This view of Judge Tucker is approved by Napton, Judge, in *Hickam* v. *Griffin*, 6 Mo. 42.

. In *Adams* v. *Lisher*, 3 Blackf. 245, Stevens, Judge, says: "It is immaterial, whether the defendant knew him to be guilty or not, if he can now prove the fact, that he was guilty, or if he can even prove, that there was probable cause to suspect him of being guilty, it is sufficient for him."

But there are several cases, in which it is held, that though probable cause really existed, but the prosecutor did not believe the party guilty or knew he was not guilty, then there was no probable cause as to him. See *Bell* v. *Pearcy*, 5 Ired. L. 83; *Delegal* v. *Highly*, 3 Bing., N. C. 950-959; *Haddrick* v. *Bishop*, 12 Q. B. 267-274. Again some have based probable cause apparently on mere belief in the prosecutor, as in *Chandler* v. *McPherson et al.*, 11 All. 916.

Other cases proceed on the idea, that the true basis of probable cause is actual belief and reasonable ground for it based on facts actually existing. Thus in *Farris* v. *Stark*, 3 B. Mon., Judge Marshall says: " If every man, who suffers by the perpetration of crime, were bound under the penalty of heavy damages to ascertain, before he commences a prosecution, that he has such evidence as will insure a conviction, few prosecutions would be set on foot, the guilty would escape, while conclusive evidence was being sought for; offences of every grade would for the most part, go unpunished, and the penal law would be scarcely more than a dead letter. The law therefore protects the prosecutor, if he have reasonable or probable cause for the prosecution, that is, if he has such ground, as would induce a man of ordinary prudence and discretion to believe in the guilt and to expect the conviction of the person suspected, and if he acts in good faith on such belief and expectation. The question is not, whether the party was

guilty, but whether the plaintiff had reasonable ground from the facts known to him and those communicated to him to believe and actually did believe the plaintiff guilty." In that case the judge states, that the jury were bound to find from the evidence, that the facts, which were the basis of the prosecution including the communications of other parties, actually existed.

In *Hall* v. *Hawkins,* 5 Humph., 359, Green, J., says: "In order to excuse the defendant it must appear, that he had probable cause for the prosecution of the plaintiff, or that he acted *bona fide* without malice. Probable cause is the existence of such facts and circumstances, as would excite in a reasonable mind the belief, that the person charged was guilty of the crime, for which he was prosecuted, that is, acting upon the facts within the knowledge of the prosecutor, if a reasonable man would believe the party guilty of the crime charged, there would exist probable cause for the prosecution. It is not sufficient, that the party really believed, that a crime had been committed, when in truth the facts within his knowledge constituted no crime. Nor will the fact, that he acted upon the opinion of counsel, excuse him, if the statement of facts, on which the opinion was founded was incorrect or the opinion itself unwarranted; 2 Stark., 496. For to constitute probable cause, the facts which are known, when applied to the law properly understood, must be sufficient to create the belief in a reasonable mind, that the party charged is guilty of the crime."

And in other cases it has been held, that good faith merely is not sufficient to protect the defendant from liability. There must be reasonable grounds. See *Hall* v. *Suydam,* 6 Barb., 84-89; *Winebiddle* v. *Porterfield,* 9 Barr, 137; *Lawrence* v. *Lanning,* 4 Porter (Ind.) 196; *Jacks* v. *Simpson,* 13 Ill., 701.

The definition of probable cause given by the Supreme Court in *Wheeler* v. *Nesbitt,* 24 How. (U. S.) 544, is: "Probable cause is the existence of such facts and circumstances, as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." This definition is approved by the Court of Appeals of Virginia in *Scott & Boyd* v. *Shelor,* 28 Gratt., 906. And Burks, J.,

regards it as equivalent to the definition found in Hilliard on Torts, ch. 16, § 18, which is : "Probable cause for instituting a prosecution is held to be such a state of facts known to and influencing the prosecutor, as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice upon the facts within the party's knowledge, to believe or entertain an honest and strong suspicion, that the party accused is guilty."

In order to reach a correct conclusion as to what is probable cause, it is necessary to examine into the foundations of the action for malicious prosecution. So great is the conflict among modern authorities, as to what is probable cause, that to determine amidst these conflicting decisions, what is the true meaning of probable cause, I propose to consider and call attention to certain principles, which all the authorities agree pervade this action for malicious prosecution.

The essential grounds, which lie at the basis of this action, were stated with great clearness and precision by Lords Manfield and Loughborough in the celebrated case of *Johnston* v. *Sutton*, 1 T. R. 546. These views have been since not only almost universally adopted in modern decisions both in England and in America, but they have been often spoken of as expressed in beautiful and appropriate language. See strong approvals of these views as well as the manner of their being stated in *Willans* v. *Taylor*, 6 Bing. 183, 188, and 2 B. & Ad. 857, 858, 859; *Mitchell* v. *Jenkins*, 5 B. & Ad. 594; *Musgrove* v. *Newell*, 1 Mee. & W. 585, 587. These views so approved and followed are thus expressed in *Johnston* v. *Sutton*, 1 T. R. 546.

" 1. The essential ground of this action is, that a legal prosecution was carried on *without probable cause*. We say this emphatically is the essential ground, because every other allegation may be implied from this ; but this must be substantially and expressly proved and cannot be implied.

"2. From the want of probable cause malice may be and most commonly is implied. The knowledge of the defendant is also implied.

" 3. From the most express malice the want of probable cause cannot be implied.

" 4. A man from a malicious motive may take up a prose-

cution for real guilt, or he may from circumstances, which he really believes, proceed upon apparent guilt, and in neither case is he liable to this kind of action.

. " 5. After a verdict the presumption is, that such parts of the declaration, without proof of which the plaintiff ought not to have had a verdict, was proved to the satisfaction of the jury.

" 6. The question of probable cause is a mixed question of law and fact. Whether the circumstances alleged to show it probable are true and existed, is a matter of fact; but whether, supposing them to be true, they amount to probable cause, is a question of law."

For convenience I have numbered the various propositions so well laid down in this celebrated opinion. To them we may add a seventh proposition implied in this opinion and expressly held in many cases and disputed by none:

7. Malice is in every case a question of fact for the determination of the jury alone.

The sixth proposition, that if the facts are admitted or are undisputed or supposed to be true, whether they amount to probable cause is a question of law and not of fact, is sustained by all the authorities. See *Broad* v. *Ham*, 5 Bing. N. C. 722, 725; *Munns* v. *Dupont et al.*, 3 Wash. C. C. 31; *McCormick* v. *Sisson*, 7 Cow. 715, 717; *Wilder* v. *Holden*, 24 Pick. 8, 17; *Miller* v. *Brown*, 3 Mo. 127, 132; *Blackford* v. *Dodd*, 3 B. & Ad. 179; *Stone* v. *Crocker*, 24 Pick. 81, 85; *Oloon* v. *Gerry*, 13 Gray 202; *Masten* v. *Deyo*, 2 Wend. 424, 428; *Varrell* v. *Holmes*, 4 Greenl. 168; *Wade* v. *Walden*, 23 Ill. 426; *Williams* v. *Norwood*, 2 Yerg. 329, 332; *Horn* v. *Boone*, 3 Strob. 307, 310; *Swaim* v. *Stafford*, 3 Ired. L. 389.

The authorities with like unanimity sustain the position, that in every case malice or want of malice is a question of fact to be determined by the jury. See *Mitchell* v. *Jenkins*, 5 B. & Ad. 588 (27 Eng. Com. L.); *Newell* v. *Downs*, 8 Blacfk. 524; *Johnson* v. *Chambers*, 10 Ired. L. 287, 293; *Hall* v. *Hawkins*, 5 Humph. 359; *Bell* v. *Pearcy*, 5 Ired. L. 83, 85.

This distinction between want of probable cause and malice is very marked and should be constantly borne in mind. The failure to do so has been the principle cause of the confusion and uncertainty so apparent in many of the decisions, as to

what is probable cause, which we have cited. There is a very marked difference between the manner, in which a question of negligence is generally to be decided, and a question of probable cause. Both of these questions have frequently been called mixed questions of law and fact; but they are so in very different senses. If the facts are numerous and complicated, the question, whether such facts admitted or supposed to be true constitute or do not constitute negligence, is generally a question of fact for the determination of the jury, and the court would err, if it instructed the jury, that certain complicated facts, which must in the nature of the case depend upon surrounding circumstances for their quality, did or did not constitute negligence. See *Washington* v. *B. & O. R. R. Co.*, 17 W. Va. — ; *Snyder et al.* v. *Pittsburgh, Cincinnati & St. Louis R. R. Co.*, 11 W. Va. 34, 35; *Baltimore & Ohio R. R. Co.* v. *Fitzpatrick*, 35 Md. 352, 354; *Baltimore & Ohio R. R. Co.* v. *Boteler*, 38 Md. 586; *Merchants Bank of Baltimore* v. *Bank of Commerce, assignee of Hoffman*, 24 Md. 43.

But the reverse of this is true, when the question is, whether there be or be not probable cause. Though in such case the facts be numerous and complicated, the question, whether they constitute probable cause, if such facts be true, is still a question of law for the court to determine; and therefore in every case the court may properly instruct the jury, that certain facts, if found to be true by the jury, constitute or do not constitute probable cause. See *Panton* v. *Williams*, 2 Ad. & E. (N. S.) 169; *Brown* v. *Connelly*, 5 Blackf. 390.

In the first of these cases the court says: "Upon this bill of exceptions we take the broad question between the parties to be this: whether in a case, in which the question of reasonable and probable cause depends not upon a few simple facts but upon facts, which are numerous and complicated, and upon inferences to be drawn therefrom, it is the duty of the judge to inform the jury, if they find the facts proved and the inferences to be warranted by such facts, the same do or do not amount to reasonable or probable cause, so as thereby to leave the question of fact to the jury and the abstract question of law to the judge? And we are all of the opinion that it is the duty of the judge so to do."

The reverse of this would be true, if the question had been

one of negligence and not of one of probable cause.  All that is left to the jury on a question of probable cause are the facts of the case, and on any assumed state of facts, however complicated, it is for the court alone to determine, whether probable cause does or does not exist.  But such is not the case, where the question is one of negligence.  The reason of this distinction is obvious.  On the question of negligence, what a reasonable person would do under a complicated state of facts and circumstances, should be left to the jury to determine.  The court is obviously less competent and fitted to decide such a question, than an ordinary business man.  Such a man can more wisely decide, how under complicated facts and circumstances a reasonable man ought to act, than could a court.  It is in its nature a question of fact and not of law.

But it is very different, where the question is, whether probable cause does or does not exist.  In such a case, however complicated the facts and circumstances may be, if they are admitted or supposed to exist, the court is always more competent to decide, whether as a reasonable man the defendant should have instituted the prosecution.  To determine such a question, no matter how numerous and complicated the supposed facts may be, the court is peculiarly fitted, as it must largely depend on correct views of the law.  A jury would be peculiarly unfitted to determine wisely such a question.  In its nature it is a question of law and not of fact.  That is, if negligence be the question, the deduction to be drawn from supposed or admitted facts is generally a question of fact for the jury; but if want of probable cause is the question, this deduction to be drawn from supposed or admitted facts is always a question of law for the court to decide.

The reverse of this however is emphatically true, where the question is: Was the defendant actuated by malice?  This is always a question of fact for the jury.  The court has no right in any case to instruct the jury, that certain supposed or admitted facts constitute malice.  It must be left to the jury in every case not only to determine the facts, but also to determine, whether from the facts malice can be inferred.  The court can never from any facts infer malice.  It is emphatically a question of fact and not of law.  Into its decision not only the facts of the case but also the opinions and motives of

the defendant must largely enter, and upon such opinions and motives the jury and the jury only should pass. The court cannot decide on the motives and opinions of the defendant wisely. In its nature such a question is emphatically a question of fact.

When therefore in the case of *Johnson* v. *Sutton*, 1 T. R. 493, Lords Mansfield and Loughborough laid down their sixth proposition : " The question of probable cause is a mixed proposition of law and fact. Whether the circumstances alleged to show it probable are true and existed is a matter of fact; but whether supposing them to be true, they amount to probable cause, is a question of law,"—it seems to me quite obvious, that when they say "whether the circumstances supposing them to be true amount to probable cause is a question of law," by the circumstances on which probable cause is thus to be based they could not have meant to include in any degree the opinions or motives of the defendants, for such opinions and motives can not form the basis of a question of law. They speak too of these "circumstances being true and existing." The very language used by them seems to me to clearly indicate, that by "circumstances," which form the basis of probable cause, they mean actual existing facts as distinguished from opinions and motives of the defendants, which however they may affect, as they certainly would. The question, whether the defendant was or was not actuated by malice, can not in any manner render the cause of the prosecution either more or less probable. That must depend, as the opinion of these learned judges, I think, indicates, on the circumstances actually existing as matters of fact. The term "circumstances" was adopted instead of the term "facts" probably because under the word "circumstances" might be included such matters as the bad character of the accused, which some might regard as not included in the word "facts," had it been used instead of circumstances, though the bad character of the accused might and ought to be regarded as an existing fact and should be included among them.

Understanding these facts in this broad sense as including the general character of the defendant at the time and all the circumstances surrounding the case, that is, not merely the ultimate facts but all just inferences from known facts, but

excluding therefrom all of the opinions, whether of law or fact, of the defendant, the only proper basis of probable cause is facts actually existing at the time the prosecution was instituted. But while actual facts so understood are the only proper basis of probable cause, yet in this basis are not to be included all the facts then existing, for to include all these facts would be obviously to hold, that to exempt the plaintiff from liability, when malice existed, would be to require him to prove, that the defendant was actually guilty of the crime, of which he was accused, which would be obviously wrong, unless his mere malice was to render him liable, which, we have seen, it never does, but combined with it must be the absence of probable cause. From the existing facts so understood must be excluded those unknown to the plaintiff, at the time he instituted the prosecution. The only existing facts, which can be included as a basis for probable cause then, are the actual existing facts either personally known to the plaintiff at that time or those believed by him to exist.

It matters not, whether this belief be based on reliable evidence or not, if it be a belief in these facts, which, it turns out, actually existed; and on the other hand if it turns out, that the supposed facts, on which the plaintiff acted, had no actual existence, they cannot be considered as the basis of probable cause, though he received the information as to such supposed facts from reliable persons and believed them and acted upon them *bona fide*. His so receiving false information from reliable sources and acting upon it *bona fide* of course constitute a proper basis for the consideration of the jury on the question of malice; but it cannot enter into the question, whether there was or was not probable cause. This must depend solely on the actual facts, understood as above explained, actually existing and known to the defendant either by his personal knowledge or by information derived from others. His opinions of either the facts or the law do not make the cause of the prosecution either more or less probable, though these opinions may make his conduct either malicious or free from all malice; and if the jury find, that he was free from all malice in its legal meaning as above explained, they may and ought to find for the defendant.

To explain myself fully I will put a supposed case: The

defendant after a most careful investigation ascertains, as he verily believes, certain facts from reliable information, which facts would lead any cautious man acting reasonably and without prejudice to believe, that the plaintiff was guilty of the crime; but being very cautious the defendant before instituting the proceeding consults eminent and disinterested counsel, who advise him on the supposed facts truly stated as believed by the defendant, that the plaintiff was clearly guilty of the crime; and thereupon the defendant has him prosecuted therefor. But it turns out, that the supposed facts, on which the plaintiff acted, really had no existence, his information being based on a mistake of his informers. In such a case there can be no doubt, some of the courts, whose opinions in reference to what is probable cause have been hereinbefore cited, would have held, that probable cause existed; and others of these courts would have held the reverse. According to the views I have expressed, in such a case no probable cause existed, though the jury might well hold in such case, that there was an absence of all malice, and therefore find the defendant not guilty; for malice must be proven to the satisfaction of the jury, though there be a want of probable cause. Upon such a state of facts the court should instruct the jury, that there was a want of probable cause, but that in addition to this want of probable cause the plaintiff must prove malice on the part of the defendant, and that in reaching this conclusion, whether there was malice on the part of the defendant, the jury would take into consideration all the circumstances, under which the defendant acted, including the information, which he had received, and also the opinion of the counsel, whom he had consulted. Doubtless under such an instruction the jury in such case would find for the defendant; and thus justice would be done without the courts encroaching on the province of the jury.

My conclusion, therefore, is that probable cause for instituting a prosecution is such a state of facts actually existing known to the prosecutor personally or by information derived from others, as would in law justify the setting on foot of the prosecution, that is, such as in the judgment of the court would lead a man of ordinary caution acting conscientiously upon these actual facts to believe the person guilty. These views

are sustained in my judgment not only by reason, but by the weight of the authorities. See *Mowrey* v. *Miller*, 3 Leigh, 561; *Spengler* v. *Davy*, 15 Gratt. 381; *Scott & Boyd* v. *Shelor*, 28 Gratt., 906; *Munns* v. *Dupont, et al.*, 3 Wash., C. C., 31 (1 Am. L. C., 200); *Hickman* v. *Griffin*, 6 Mo., 37-42; *Adams* v. *Fisher*, 3 Blackf. 341; *Raulston* v. *Jackson*, 1 Sneed, 132; *Faris* v. *Starke*, 3 B. Mun. 4-6; *Hall* v. *Hawkins*, 5 Humph. 257-259; *Hall* v. *Suydam*, 6 Barb., 84-89; *Winebiddle* v. *Porterfield*, 9 Barr, 137; *Lawrence* v. *Lanning*, 4 Porter (Ind.) 196; *Jacks* v. *Stimpson*, 13 Ill., 701; *Wheeler* v. *Nesbitt*, 24 How. (U. S.) 544.

As the law presumes, that every public prosecution is founded on probable cause, the burden of proving the want of probable cause must be in the first instance on the plaintiff. He must therefore in every such case show *some* evidence of the want of probable cause, before the defendant can be called upon to justify his conduct. But, as the plaintiff is thus called upon to prove a negative, slight evidence is often regarded as sufficient to prove such want of probable cause. See *Williams* v. *Taylor*, 6 Bing. 183 (19 E. C. L. 49.) In the same case reported as *Taylor* v. *Williams*, 2 B. & Ad. 845 (22 Eng. Com. Law 199), Lord Tenderden says:

"The want of probable cause is in some degree a negative, and the plaintiff can only be called upon to give some, as Mr. J. Le Blune, a most accurate judge, says, slight evidence of such want. As then slight evidence will do, why might not the circumstances of this case be left to the jury as grounds for a conclusion of fact? What conclusion they would have drawn is another thing."

In *Cotton* v. *James*, 1 B. & Ad. 128 (20 Eng. Com. L. 360), Lord Tenderden, Chief Justice, expresses himself still more clearly. He says: "In general the plaintiff must give some evidence showing the absence of probable cause; but such evidence is in effect the evidence of a negative, and very slight evidence of a negative is sufficient to call upon the other party to prove the affirmative, especially when the nature of the affirmative is such as to admit of proof by witnesses, and cannot depend on matters lying exclusively within the party's own knowledge, as in some cases of criminal prosecutions it may be."

There is some difference of opinion, whether an acquittal of the plaintiff on the trial by a jury is *prima facie* evidence of a want of probable cause, many cases holding, that it is not. But it is obvious, that there is a great difference between the acquittal of the plaintiff by a jury and his discharge by an examining magistrate, or the refusal of a grand jury to indict. It would be the duty of the jury to acquit the defendant, if on all the evidence there was a reasonable doubt of his guilt, even though they might believe he was probably guilty of the crime. But the magistrate or grand jury would violate his or their duty, if he or they discharged the accused, when the evidence produced the belief, that he was probably guilty of the crime. He or they act directly on the question, whether there is probable cause for the prosecution; and if he or they discharge him, it must be, because in his or their judgment there is no probable cause for the prosecution; and accordingly the weight of authority and of reason is, that such discharge by a justice or by a grand jury is *prima facie* evidence, that there is a want of probable cause for the prosecution. See *Nicholson* v. *Coghill*, 6 Dow. & Ry. 13, 14, and 4 Barn. & Cress. 21-24; *Johnston* v. *Martin*, 3 Murph. (N. C.) 248; *Plummer* v. *Gheen*, 3 Hawks 66-68; *Johnson* v. *Chambers*, 10 Ired. L. 287-292; *Bostic* v. *Rutherford*, 4 Hawks 83-87; *Williams* v. *Norwood*, 2 Yerg. 327-336. There are it is true some authorities to the contrary. See *McRae* v. *O'Neal*, 2 Dev. 166-169 and especially *Israel* v. *Brooks*, 23 Ill. 578. But of course such a discharge is but *prima facie* evidence, and it may be rebutted, as the above authorities show.

If there be a dispute about the facts in a case, and the evidence is contradictory on the facts entering into the question, whether there be probable cause, the proper course is for the judge to leave the question of probable cause to the jury with instructions upon the law to be applied to the different phases, which the facts proven may in the mind of the jury assume, that if they find one state of facts, then there was no probable cause, but if they find that another state of facts existed then there was probable cause, and they must find for the defendant. See *McDonald* v. *Rooke*, 2 Bing. N. C. 217 (29 E. C. L. 312); *Masten* v. *Deyo*, 2 Wend. 427; *Hall* v. *Suydam*, 6 Barb. 87; *Weinberger* v. *Shelly*, 6 Watts. & S. 342; *Crabtree* v.

*Horton,* 1 Munf. 59; *Maddox* v. *Jackson,* 4 Munf. 465. It would be error in the court, if asked to give such instructions, to decline to do so and to leave the whole question, as to whether there was probable cause, to the jury.   See *Ulmer* v. *Leland,* 1 Greenl. 138; *Plummer* v. *Gheen,* 3 Hawks 70.

If it be proven, that there is a want of probable cause, the natural presumption is, that the defendant knew, there was no probable cause; but this presumption may be rebutted. *Sutton* v. *Johnston,* 1 T. R. 269; *Michell* v. *Williams,* 11 Mee. & W. 205.

Having considered the various legal questions, which arise in this case, I propose to apply this law to the facts presented by this record.   The first question, which was presented on the trial ôf this case, was the motion of the defendants to exclude from the jury all the evidence offered by the plaintiff, when he rested his case on his evidence in chief.   This motion was based on the ground, that the plaintiff's evidence showed no cause of action against the defendants or either of them.   It was in effect the equivalent of a demurrer to the plaintiff's evidence.   See *James & Mitchell* v. *Adams,* 8 W. Va. 568.   The plaintiff's evidence in chief proved satisfactorily the first requisite to be proven by the plaintiff, that is, that the prosecution alleged in the declaration had been set on foot and conducted to its termination, and that it had ended in the final discharge of the plaintiff by the justice.

The record shows, that the warrant, which had been issued for the arrest of the plaintiff, was legal and valid; that the plaintiff was arrested by the proper officer, brought before a justice having jurisdiction to examine into the case, and after such examination the complaint was dismissed and the plaintiff discharged finally.   The proof is, as we have seen, full and ample on this point.

The second requirement, that this prosecution was instigated and procured by the co-operation of the defendants, was also satisfactorily proven by the plaintiff's evidence in chief.   It was proven, that the warrant was issued on the complaint on oath of one of the defendants, A. S. Core, and that the other defendant, B. S. Compton, was together with Core at the trial of the case before the justice; that Compton employed counsel to aid in the prosecution, and consulted and advised with

them during the progress of the case, asking questions himself of the witnesses, and taking an active part in the prosecution with Core, the other defendant. It was also testified by a witness, that the defendant, Core, had said, that Compton had persuaded him to persecute the plaintiff. This evidence upon the principles we have laid down and on the authority of the case of *Scott & Boyd* v. *Shelor*, 28 Gratt. 901, was ample to prove, that the prosecution was instigated and procured by the co-operation of the defendants.

The third requisite, that the prosecution was without probable cause, was sufficiently met by the simple proof, that it had been dismissed by the examining justice as unfounded; this alone being, as we have seen, *prima facie* evidence that the prosecution was without probable cause. This *prima facie* evidence was not in any manner rebutted by the plaintiff's evidence in chief, and may in fact be regarded as somewhat strengthened by the testimony of one witness, that the defendant, Core, had said, that his co-defendant, Compton, had persuaded him to *persecute* the plaintiff.

The only remaining requisite for the plaintiff to prove was, that the prosecution was malicious. This, we have seen, the jury might infer from the fact, that the prosecution was without probable cause; and on such a motion as was before the court operating as a demurrer to evidence by the defendants it is clear, that no other evidence of malice was necessary. But had it been, the evidence of malice was abundant in the plaintiff's evidence in chief. Not only was it testified, that one of the defendants stated, that the other had persuaded him to persecute the plaintiff, but the constable proved, that there was with the warrant, when given him, a note to him from the counsel of defendants requesting him to go to the pumping station and take possession of the oil alleged to be stolen by the plaintiff, and if he got possession of the oil, he was not to serve the warrant in his hands on the plaintiff. And after the trial was over the plaintiff proved that one of the defendants said to him : "I suppose you will make us pay for this, Colonel." Certainly from these facts the jury had a right to infer malice, especially when it is borne in mind, what is the true legal meaning of the term malice as explained hereinbefore.

The court therefore did not err in refusing to exclude the

plaintiff's evidence in chief from the jury, on the ground that it showed no cause of action against the defendants or either of them.   The plaintiff's evidence in chief made a case, which entitled him to a verdict against both the defendants.

The next enquiry is: Did the defendants' evidence and the rebutting evidence of the plaintiff so change this case, as to make it the duty of the jury to find a verdict for the defendants?   It clearly did not; it made the plaintiff's case stronger, not weaker.   The co-operation of the defendants in procuring the prosecution of the plaintiff for the felony charged was by it proved clearly.   The facts proved by the plaintiff's evidence in chief were in no degree contradicted, except that the defendant, Core, says, he did not say, that the defendant, Compton, had persuaded him to persecute the plaintiff, but he only said he persuaded him to prosecute the plaintiff; and he denies, that after the examination of the plaintiff before the justice and his discharge by him he told the plaintiff, he supposed he would make them pay for it.   But he proves himself, that the defendant, Compton, urged him to prosecute the plaintiff for this alleged felony, and he refused to do so for several days, till he was advised to do so by the prosecuting attorney of the county, who was his son-in-law.   The want of probable cause was also distinctly proven by this evidence.

The facts proven to exist, when this prosecution was commenced, were, that the plaintiff was the tenant of The West Virginia Oil and Oil Land Company, and as such was engaged in pumping oil from certain wells on the leased property into a tank; that by the contract or lease, which was not produced, the landlord was entitled to one-third of the oil produced by the tenant, to be delivered at any time the landlord called for it; that the defendant, Core, claimed, that whatever royalty or rent was due from the tenant, when this prosecution was instituted, had been assigned to him by the landlord on certain trust.   This assignment was produced, and on its face it shows, that this claim of the defendant, Core, was unfounded.   The assignment had been made some two months and a half before this alleged felony of the plaintiff was said to have been committed.   The language of the assignment was: "do hereby transfer to A. S. Core three thousand barrels of oil ranging from twenty-eight gravity to

thirty-five gravity inclusive." This was the only description of the oil transferred by this assignment. It must be regarded as legally meaning oil, which at the time of the assignment had been produced, and would not include any oil purchased subsequent to the time of this assignment. Most of the oil, which the plaintiff was charged with stealing, was produced subsequent to the time of the assignment, and therefore could not have belonged to the defendant, Core.

Whether there was any oil due to the West Virginia Oil and Oil Land Company, at the time this alleged felony was said to have been committed, is not shown by the evidence. The plaintiff denied, that there was any royalty or rent due. The defendant, Core, claimed, that there was due forty-one barrels and thirty-seven gallons. The plaintiff refused to deliver any oil as rent or royalty. By the contract or lease the plaintiff had no right to remove any of the oil out of the tanks, into which he had pumped it, without first giving the landlord notice of his intention, so as to give the landlord an opportunity of having the oil on hand measured and claiming its share thereof as rent or royalty. The plaintiff sent word to the landlord's agent, that he was about to remove the oil in the tank ; but the message was not delivered, and on the 29th day of April, 1876, being Saturday at four or five o'clock P. M., all the oil in the tank was by the plaintiff's direction run off in a tube to a tank some half a mile distant on the railroad, and some five days thereafter it was shipped by the plaintiff.

The right to use this tube to run off oil belonged to the party, who at plaintiff's instance ran off this oil in this tube, only till the evening of the next day ; and thereafter the right to use this tube to run off oil belonged exclusively to the West Virginia Oil and Oil Land Company. It took the whole of Saturday night and a part of Sunday to run off this oil in this tank. The party so running it off measured the oil before it was run off and was the same person, who was trusted generally by the landlord as well as tenant to measure the oil, when it was to be run off. The oil was not run off clandestinely, and the party, who ran it off and measured it, on Monday morning, the day after it was run off, notified the proper agent of the landlord, The West Virginia Oil and Oil

Land Company, of the fact, that it had been run off into the tank on the railroad and of the quantity of oil so run off at that time, and for some days afterwards the oil was not shipped to market.

On the 5th of May, 1876, the defendant, Core, made affidavit that the plaintiff "did feloniously take, steal and carry away forty-one barrels and thirty-seven gallons of oil of the value of $150.00, the goods and chattels of the affiant." A justice issued thereupon his warrant for the arrest of the plaintiff on this complaint and required him to be brought before him to answer this complaint, and to be further dealt with according to law; and after an examination, extending over a part of two days the complaint was dismissed, and the plaintiff discharged from custody by the justice.

This was substantially the case proven, so far as it bears on the question of probable cause. The jury had a right, as we have seen, to presume, that the defendants knew all the above facts, unless the contrary is shown. In this case the contrary is not shown except in relation to the single fact, that before the oil was run off in the tube by the plaintiff's direction, the plaintiff sent a messenger to his landlord's agent notifying him, that the plaintiff was about to remove the oil; that the plaintiff sent this message was not, I infer from the evidence, known to the defendants or either of them, till after this prosecution of him for felony was instituted. All the other facts stated were no doubt known to both of the defendants or believed by them, when this prosecution was instituted by them.

Upon this state of facts as known to the defendants or believed by them there can be no question, but that the prosecution was set on foot without any probable cause. And by the law, as we have seen, these are all the facts and circumstances, which can be considered by the court in determining, whether there was or was not probable cause.

The malice of each of the defendants is proved by the evidence with equal clearness. From the law, as we have heretofore stated, the jury not only had a right to infer malice from the want of probable cause, and when as in this case the facts proven show not only, that there was an absence of probable cause, but that there was not the slightest ground for any sus-

picion, that the crime charged had been committed, it was clearly the right and the duty of the jury to infer malice from the simple fact, that an entirely groundless prosecution had been set on foot. It is almost impossible in such a case to imagine, that such a prosecution was instituted from any other motive than a malicious one, understanding the term in the sense, which we have before given it, that is, its legal and not its ordinary meaning.

But in this case we are not left to infer the malice from the want of probable cause, for it is clearly proven to have been entertained actually by each of the defendants. The defendant, Core, admitted, that his motive in instigating this prosecution was to obtain possession of this forty-one barrels and thirty-seven gallons of oil, that he claimed; and the defendant, Compton, also admits that this was his principal motive for instigating this prosecution. We have seen, that this motive is in law malice; and the jury could not do otherwise than decide, that this unfounded prosecution was instigated by malicious motives on the part of both of the defendants. The fair inference from this is, that the letter written by their attorney to the constable directing him to take possession of the oil, and if he could get it, not to serve the warrant, was one which he was authorized to write, and which expressed truly the views and the motives of both the defendants.

The court clearly did not err in refusing to set aside the verdict of the jury as contrary to the law and evidence.

Did it err in refusing to set aside this verdict, because the damages assessed by the jury, $10,000.00, were excessive and in reducing the damages to $5,000.00, and on the plaintiff assenting to this reduction entering up a judgment for $5,000.00? The measure of damages in actions bearing more or less resemblance to an action for a malicious prosecution varies according to the circumstances of each case. If there be no fraud, actual malice or oppression on the part of the defendants, the measure of damages is what is called compensatory, meaning thereby not merely the amount, which the plaintiff's estate has been diminished by the wrong done by the defendants, that is, his pecuniary loss, as the phrase is generally understood, but also an amount, which will fully compensate the plaintiff for all his mental and bodily suffering directly con-

sequent on the wrong. See *Sweeney* v. *Baker*, 13 W. Va., 218. Of course from the very nature of the elements, which enter into the estimate of such damages of the plaintiff, they must necessarily be very uncertain in amount, and very much must necessarily be left to the discretion of the jury in every such case.

But if the defendant has been actuated by actual malice, or a design to injure the plaintiff, or fraud and oppression has entered into his conduct, the decided weight of the authority, both English and American, holds, that the jury may inflict on him exemplary or punitive damages as a punishment for his misconduct and to hold up an example to the community. There have been a few very respectable courts and writers, who have held, that in no case can a jury inflict on a defendant punitive damages. But the overwhelming weight of authority, both English and American, is, that in certain cases such punitive damages may be inflicted. I will only refer to a few cases in actions for malicious prosecution and those which most nearly resemble this action in the nature of the wrong inflicted, such as libel and slander, in which it has been held, that in certain cases of this character punitive damages may be inflicted by the jury. See *Barnett* v. *Read*, 51 Pa. 191; *Cooper* v. *Utterbach*, 37 Md. 284; *Fry* v. *Bennett*, 4 Duer 247; *Gilreath* v. *Allen*, 10 Ired. L. 67; *Hosley* v. *Brooks*, 20 Ill. 115.

In the first of these cases, which was an action for maliciously issuing an execution against the plaintiff in the action, when the defendant knew, that the judgment, on which the execution was issued, was paid, the court lays down this rule: " Where the malice necessary to sustain such an action is only such as results from a groundless act, and there is no actual malice or design to injure, the rule is compensatory damages. But where actual malice exists, a formed design to injure and oppress, the jury may give vindictive damages to punish the defendant for his fraud and malice." This was, it seems to me, the proper rule of damages in that case, as the character and reputation of the plaintiff was not injured by the wrongful act of the defendant.

*Cooper* v. *Utterbach* was an action for the malicious prosecution of the plaintiff for an alleged crime without probable

cause. The instruction approved by the court in that case in reference to the measure of damages was: " If the jury find for the plaintiff, the measure of damages is such an amount, as the jury may find will compensate the plaintiff for the actual outlay and expenses about his defence in the criminal trial, and for his loss of time, and for the injury to his feelings, person and character by his imprisonment and prosecution ; and the jury may also, if they find said prosecution to have been pursued by the defendant for his private ends and with reckless disregard to the rights of the plaintiff, give such punitive damages, as they may think proper to award, for such conduct on the part of the defendant."

It will be observed, that the court did not, as in the Pennsylvania case, direct the jury to give punitive damages, only " where there was a proved design on the part of the defendant to injure and oppress," but said, they might give punitive damages, " if the prosecution had been pursued by the defendant for his private ends and with reckless disregard of the rights of the plaintiff." This of course might be done " without any formed design to injure and oppress the plaintiff." The difference in these rules for the measure of damages in these cases was, I conceive, based on the character of the two cases. In the Pennsylvania case the reputation of the plaintiff was not necessarily injured by the wrongful act of the defendant, while in the Maryland case it was, he having been arrested and prosecuted for an alleged crime. In such a case the rule laid down in the Maryland case is the true rule for the measure of damages, and it should be applied in the case before us.

If this is a proper case for punitive damages, it is obvious, that the amount of such damages must necessarily be very uncertain and must be left almost solely to the discretion of the jury, a discretion, with which the court cannot interfere, unless it was very grossly abused. In the case before us both of the defendants co-operated in procuring a prosecution of the plaintiff for an alleged felony and without any probable cause. If either of them procured this prosecution to be set on foot for his private ends and with reckless disregard of the plaintiff's rights, the jury might assess punitive damages against them both to the full extent, which the misconduct of one of

them might require, though the motives of the other may have been less objectionable, and the damages, with which he should be charged, much less, had he not been connected with his co-defendant as a joint wrong-doer.  For if two persons unite in doing a wrongful act they are both responsible to the plaintiff jointly for the largest amount of damages, for which either of them might be properly mulcted by the jury. *Halsey* v. *Woodruff*, 9 Pick. 555; *Fuller* v. *Chamberlain*, 11 Metc. (Mass.) 503.

The amount of damages assessed by the jury in this case, $10,000.00, may indicate, that they regard the case proven to be one in which they might give punitive damages; but if they did, could the court below, or can this Court, on a motion for a new trial hold, that the jury did wrong in so considering.  It seems to me clearly that we could not.  Both defendants in their testimony state, that their main object in instituting the prosecution was to get possession of the oil.  And, that this was so, is demonstrated by the letter of their attorney addressed to the constable directing him not to serve the warrant, if he could get possession of the oil which they charged the plaintiff with stealing.  From that the jury had a right to infer, that the "prosecution was instituted for their private ends."  Had the jury a right to infer, that it was also "with a reckless disregard of the plaintiff's rights?"  If they had a right to draw this inference, they might, as we have seen, inflict punitive damages on the plaintiff.  They would certainly have had a right to draw this inference from the utter groundlessness of the charge and their full knowledge of its utter groundlessness, unless there were other circumstances shown, which relieved the defendants from this apparent utter disregard of the plaintiff's rights.

Two circumstances are relied on as showing, that the defendants did not thus recklessly disregard the plaintiff's rights.  One was, that the defendant, Core, refused for several days to institute this prosecution, and was very reluctant to do so, and did not do it, till he was persuaded so to do; and he was on friendly terms with the plaintiff.  But this can avail him nothing, because the evidence shows, that his co-defendant never exhibited any reluctance to institute this prosecution, but from the beginning urged, and pertinaceously urged, that

the prosecution should be instituted. He had been on un-friendly terms with the plaintiff for four years, had been at law with him in various suits. Their relations were so hostile, that he tried to have him, the plaintiff, indicted in the Feder-al Court for perjury, and he still entertained toward him these embittered feelings,and they were exhibited by the employment of counsel to aid in the prosecution of the plaintiff and by his persistant urging of his co-defendant to institute the prosecu-tion.

There is another circumstance relied on by the defendants to show, that they were not reckless of the plaintiff's rights in instituting this prosecution, and that is, that before doing so they were advised to do so by counsel, who was an experienced lawyer and the prosecuting attorney of the county. In the case of *Hewlett* v. *Cruchley,* 5 Taunt. 277, where advise of counsel was relied upon by the defendant in a suit of this char-acter, Heath, Judge, says : " I am persuaded, that personal conferences must have taken place, in which the case must have been strongly stated to the counsel. It would however be a most pernicious practice, if we were to introduce the prin-ciple, that a man by obtaining the opinion of counsel, by ap-plying to a weak man or an ignorant man, may shelter his malice in bringing an unfounded prosecution." Chambers, Judge, says : " With regard to the opinion of counsel, I lay that out of the case, agreeing that it would be very dangerous to admit such sort of evidence to shelter persons from the ef-fects of their malice."

In *Collard* v. *Gay,* 1 Tex. 494, Lipscomb, Judge, delivering the opinion of the court says : "Mr. Starkie lays down the rule as to taking the advice of counsel in the following language : ' The defendant may give in evidence any facts, which show, that he had probable cause for prosecuting, and that he acted *bona fide* without grounds of suspicion. It is no answer to the action, that the defendant acted upon the opinion of counsel, if the statement of facts upon which the opinion was founded was incorrect, or the opinion was itself unwarranted.' 2d vol. Starkie, p. 495. It would appear then, that the opinion of counsel would have been no defence and might have been re-jected. If the facts stated to the counsel were true, and such as justly raised a suspicion of felony, such proof would have

shown probable cause without the opinion of counsel, and if not true, or not amounting to what would have established probable cause, no additional weight could have been imparted by the advice of an attorney."

In *Williams* v. *Vanmeter*, 8 Mo. 343, Scott, Judge, says: "It has been held, that in prosecutions for malicious arrest it may be given in evidence, that the party acted under the advice of counsel. In an analogy to that case the defendant in actions for malicious prosecution would probably be permitted to show, that in good faith and upon a full representation of all the facts he was advised by counsel, that a prosecution was warranted. But to permit the counsel of those, of whose capacity we have no means of judging, and who owe no responsibility to the courts, to be received as evidence, would lead to collusion and furnish a ready defence to all actions like the present." In *Blunt* v. *Little*, 3 Mason 102, Justice Story says: "It is certainly going a great way to admit the evidence of any counsel, that he advised a prosecution upon a deliberate examination of the facts, for the purpose of repelling the imputation of malice and establishing probable cause. My opinion however is, that such evidence is admissible, although it is sometimes open to the objection stated in *Hewlett* v. *Cruchley*, 5 Taunton R. 277. But it appears to me, a necessary qualification of the admission is, that it should appear in proof, that the opinion of counsel is fairly asked upon the real facts and not upon statements, which conceal the truth or misrepresent the case."

The authorities generally seem to have adopted these views of Judge Story, except that such advice is no evidence of probable cause, but it is admissible as evidence of a want of malice. See *Eastman* v. *Keasor*, 44 N. H. 518; *Leaird* v. *Davis*, 17 Ala. 27; *Stone* v. *Swift*, 4 Pick. 389; *Chandler* v. *McPherson*, 11 Ala. 919.

The law is thus stated in *Bartlett* v. *Brown*, 6 R. I. 40: " Although there has been some question, how far the advice of counsel can shield a defendant in an action of this sort yet the weight of authority and, it seems to us, the more reasonable opinion is, that if the defendant is not in fault, but has been wrongfully advised as to his rights upon a state of facts fully and fairly presented by him to a professional man, whose

candor and skill he had no reason to doubt, the advice will be
a sufficient protection for him." See *Snow* v. *Allen*, 1 Stark.
502; *Ravenga* v. *Mackintosh*, 2 B. & C. 693; *Tompson* v.
*Massey*, 3 Greenl. 310; *Stevens* v. *Fassett*, 27 Me. 266; *Hall*
v. *Suydam*, 6 Barb. 83; *Walter* v. *Sample*, 25 Pa. St. 275;
*Kendrick* v. *Cypert*, 10 Humph. 291. But *contra*, see *Clem-
ents* v. *Ohrly*, 2 Car. & Kirw., 686-869, per Lord Denman.
There can, I think, upon these authorities be no question, but
that if the defendant states to competent counsel, who is dis-
interested, fully and fairly all the facts, which he knew or by
reasonable diligence could have ascertained, and he advised
him, that on these facts the plaintiff is guilty of the crime
and should be prosecuted, such advice would so far at least
protect the defendant, as to render his conduct not a "reck-
less disregarding of the plaintiff's rights;" and if it did not
for want, of malice relieve him from all liability, it would at
least relieve him from a liability to *punitive* damages.

It is claimed, that the advice given in this case relieved the
defendants from all liability, or at least from punitive dam-
ages, such as were inflicted by the jury. The jury might, I
think, well decline to give to the advice of counsel as proven
in this case any such effect. First, it was not the advice of
disinterested counsel. While he was the prosecuting attorney
of the county and had long been practicing law, the advice
given in this case appeared clearly to have been given not in
his official capacity as public prosecutor of the county, but
rather as counsel for his father-in-law, one of the defendants,
whose object in taking this advice, as it was the purpose of
the lawyer in giving it, was rather to promote his own pri-
vate pecuniary interest than the public interest. The attor-
ney also had $400.00, which was with other debts to be paid
out of the oil, which had been, as was supposed, transferred to
his father-in-law, and the oil, which it was alleged the plain-
tiff had stolen, was claimed to be a part of this oil. The ad-
vice given was given expressly as the best mode in this attor-
ney's judgment of getting possession of this oil; and he ac-
cordingly wrote a letter to the constable, in whose hands the
warrant, which he advised should be sued out, was placed, and
instructed him to take possession of this oil, and if he suc-
ceeded in so doing, not to arrest the plaintiff. Advice given

under such circumstances and with such an object ought not to have been followed, even had it been given under the fullest statement of the facts. We cannot however suppose a full and fair statement of all of the facts could have been made to him, as on such statements we cannot conceive, that such advice could have been given by a lawyer.

The facts as stated to this attorney are thus testified to by him: "The defendants, Core and Compton, came to my office. Core said; he had a lot of oil, for which he held a bill of sale—3,000 barrels of oil made up of royalties—and that on the 29th day of April Vinal removed from a tank on the West Virginia Company's territory to a tank on the Gale tract, in the night-time without his consent or permission, forty-one barrels of oil; that he, Core, was the owner and held possession of this oil." Was this the full and fair statement of all the facts necessary to furnish the defendant any protection, when he relies on the advice of counsel? The most material part of these so-called facts was not true. It was not, as we have seen, true, that the defendant, Core, owned this oil, nor was it true, that he ever had any sort of possession of this oil. And without this it certainly could not have been stolen from him, as in the affidavit drawn by this counsel he stated. His statement unexplained, that the oil had been removed from a tank on the West Virginia Oil Company's land without the owners' consent in the night-time, might well have had an appearance to this attorney of a clandestine and felonious taking and carrying away; but if he had stated the whole facts, it could not have presented any such appearance.

Had he told this attorney all the facts, that before the oil was run off in the tube to another tank, it had been carefully measured by a party, whom the company always got to measure the oil, in which they had an interest, and that the very next morning after this oil was completely removed, the agent of the company was notified of the removal and of the quantity removed, that the removal was not done clandestinely nor secretly, but was commenced at 4 or 5 o'clock in the evening and was continued till some time in the next day; that Vinal had possession of this oil, and claimed it as his own and had refused to give up the possession of it to Core, it would seem

impossible for any lawyer to have advised, that the plaintiff was in removing this oil guilty of larceny.

My conclusion is, that such advice given under such circumstances furnished no sort of protection to the defendants, and that despite such advice the jury in this case could give punitive damages against them.

It is claimed too, that the warrant was issued by a blunder of the justice; that the facts were stated to him, and on these facts he issued the warrant. This however does not appear to be the case. It was only stated to him that the facts were derived from others, but it does not from the evidence appear, that any statement of them was made to the justice, much less that a full statement was made. The facts sworn to by the defendant, Core, before this justice, prove the contrary. His affidavit was: "John F. Vinal did feloniously take, steal and carry away forty-one barrels and thirty-seven gallons of oil of the value of $150.00. of the goods and chattels of the affiant." This affidavit is not on its face based on the information of others; and if its statements had been true, the plaintiff must have been found guilty of the felony. These are his own statements made on his own knowledge, so far as the affidavit shows, and his own responsibility; and the responsibility incurred in making them and in getting them acted on by the justice cannot be shifted.

The jury had a right to do, what it is supposed they did do, inflict on the defendants punitive damages for this outrage committed on the plaintiff, unless, as it is claimed, the plaintiff in removing the oil, he was alleged to have stolen, was guilty of a gross fraud. It is claimed, that he had no *bona fide* claim to this forty-one barrels and thirty-seven gallons of oil, and that in appropriating it he was guilty of a gross fraud on the defendant, Core, or his assignor, The West Virginia Oil and Oil Land Company, of which the other defendant, Compton, was the president. If this be true, the jury not only erred in giving him punitive damages, if they did so, but it ought to be regarded as mitigating and diminishing his damages based on the compensatory principle. One of the principal items of damages on the compensatory principle in every action of this character is the injury to the plaintiff's reputation as a man of integrity and honesty by his being

arrested and prosecuted for a felony. Therefore in every such case his general bad character may be proven in mitigation of damages. See *Israel* v. *Brooks*, 23 Ill. 575; *Bacon* v. *Towne*, 4 Cush. 217; *Martin* v. *Hardesty*, 27 Ala. 458; *Rodriguez* v. *Tulmine*, 4 Esp. 721.

If therefore in the very transaction, out of which the charge of felony arose, the plaintiff was guilty of a gross fraud, though such fraud could not justify or excuse the defendants in instituting the prosecution for felony, unless they had probable cause or were entirely free from malice or improper motives in so doing, still the damage to the plaintiff's reputation would thereby be much diminished, and he could set up no claim to punitive damages. See *Munns* v. *Dupont et al.*, 3 Wash. C. C. 31.

So far has this been carried, that in *Sears* v. *Hathaway et al.*, 12 Cal. 277, where the plaintiff had incurred all the moral guilt of the offence, for which he was prosecuted and arrested, although he was not technically guilty and had evaded the penalty of the law, it was held, that if entitled to any damages, he was entitled only to the actual damage which he had sustained by the arrest; and the jury having allowed more, their verdict was set aside. The court well says : "It is folly to talk of damages for an injured reputation caused by the imputation of a crime, the whole moral guilt of which had been incurred."

But unfortunately for the defendants in this case the evidence fails to prove, that the plaintiff in removing this forty-one barrels and thirty-seven gallons of oil was guilty of any fraud. It is claimed, that this oil belonged to Core or to his assignor, the West Virginia Oil and Oil Land Company, and that the plaintiff in appropriating it to his own use without their consent was guilty of a gross fraud, as he had no *bona fide* claim thereto, and that his claim to this oil was a mere pretence set up to cover a gross fraud perpetrated by him in removing it, as he did. But the evidence utterly fails to establish such a case. I have set out all the evidence on this point in the statement of the case ; and I have carefully examined it. It is unnecessary to repeat it. But a careful examination of it leads me to the conclusion, that the plaintiff's claim was, that Hoffmire & Co. were entitled by virtue of an

8

assignment made to them by one Backus, who was an assignee of the West Virginia Oil and Oil Land Company, of three-fourths of the royalty-oil due from the plaintiff to the said Oil Company, his landlord, that was produced between January 1 and May 1, 1875; that this oil, to which Hoffmire & Co. were entitled, exceeded forty-two barrels; that on August 16, 1875, in the absence of the plaintiff the West Virginia Oil and Oil Land Company took from his tank and carried away the whole of the royalty due between the above periods, thus wrongfully taking more than forty-two barrels of oil due to Hoffmire & Co.; that on March 1, 1876, the plaintiff paid Hoffmire in full for this royalty-oil, and he thus became entitled to it, and being so entitled to it, and it being in his possession, he appropriated it to his own use.

The defendant, Core, as assignee of this oil company, subsequent to their assignment to Backus claimed this forty-one barrels and thirty-seven gallons of oil as royalty due from January 1, 1876, to May 1, 1876. This claim or rather the claim of this assignor, the said West Virginia Oil and Oil Land Company, was well founded, if they had not improperly taken a like quantity of oil belonging to Hoffmire & Co., the plaintiff's assignor, in the August preceding. But if they had, their claim to this oil was unfounded, unless it can be sustained on the basis of a certain compromise made by the West Virginia Oil and Oil Land Company and Hoffmire & Co. on February 7, 1876. This compromise on its face, unexplained by the papers in certain suits referred to in it but not produced, can not, so far as I can understand it, operate to give the West Virginia Oil and Oil Land Company a right to this oil produced between January 1, 1875, and May 1, 1875, which they had taken from the plaintiff in his absence from home, if that oil was really due to Hoffmire & Co. Whether it was so due, it is impossible to say from the evidence now in this case, as the assignment from Backus to him was not produced.

In this state of the case the jury had a right to infer, that the claim of the plaintiff to this forty-one barrels and thirty-seven gallons, which was in his possession, and which he appropriated, was a *bona fide* claim, which he acquired from Hoffmire & Co., who claimed, that this oil belonged to them. Whether this claim of the plaintiff was in law good or not, it

is impossible from the evidence now in the case to say; but from the evidence the jury had a right to infer, that it was believed to be a good and lawful claim by the plaintiff. If this be so, it was no fraud in him to appropriate this oil to his own use; and this appropriation of it, if the plaintiff believed it belonged to him, without the consent of the West Virginia Oil and Oil Land Company or their assignee, Core, was under the circumstances a very slight impropriety of conduct on the part of the plaintiff, as the West Virginia Oil and Oil Land Company, as he believed, had taken from his tank and appropriated to their use in the August preceding a like quantity of oil, which did not belong to them, without his knowledge or consent.

The evidence then showing no fraud or grossly immoral conduct on the part of the plaintiff, there were no circumstances in the case to mitigate the damages, which the jury ought to have assessed in the case, and under all the circumstances they might, if they thought proper, assess against the defendants punitive or exemplary damages. Their verdict of $10,000.00 damages, though heavy, ought not to have been in such a case as this set aside. The defendants were both wealthy men worth each between $100,000.00 and $200,000.00; and if they were to be adequately punished for their outrage, it could only be done by the assessment of large damages. It is well settled in cases of this character, that a new trial ought not to be granted especially by the Appellate Court, unless the damages assessed are so enormous as to furnish evidence of prejudice, partiality, passion or corruption on the part of the jury. See *Sweeney* v. *Baker*, 13 W. Va. 222; *Spencer* v. *McMasters et ux*, 16 Ill. 405; *Coleman* v. *Southwick*, 9 Johns. 51; *Southwick* v. *Stevens*, 10 Johns. 444; *Treanor* v. *Donahoe*, 9 Cush. 228; *Moody* v. *Baker*, 5 Cow. 351; *Highmore* v. *Harrington*, 3 Scott N. S. 143 (91 Eng. C. L.); *Neal* v. *Lewis*, 2 Bay (S. C.) 204. I cannot see, that the verdict for $10,000.00 in this case, though certainly large, was so enormous as to justify either the circuit court or this Court in setting aside the verdict.

The circuit court in this case deemed the damages so excessive, that the verdict of the jury ought to be set aside, and a new trial awarded, unless the plaintiff would consent to remit

$5,000.00 of the damages, which he consented to do, and thereupon the court refused to grant a new trial and entered up judgment for the $5,000.00 with interest from the day the judgment was entered and costs.    It is said by the defendants' counsel, that this action of the court was unauthorized and illegal, and that in a case of this kind, if he deemed the damages awarded so excessive, that the verdict ought not to stand, he could only award a new trial and could not properly on a matter of one half of the damages refuse a new trial and enter up a judgment.

There has been in such cases some diversity of practice in the courts of the different States.    The correct rule on this subject is, I think, laid down in *Nudd* v. *Wells et al.*, 11 Wis. 415.    The court in that case says :

" It is evident, that the jury in this case found a verdict much larger than the plaintiff was entitled to by any legal rule of damages.    But if the excess was clearly ascertainable, and the proper amount of damages might be readily fixed by the application of a settled rule of law to the evidence, perhaps the practice adopted by the court below, of allowing the plaintiff to remit the excess and then refusing a new trial, would be proper.    The practice of remitting, when the illegal part is clearly distinguishable from the rest and may be ascertained by the court without assuming the functions of the jury and substituting its judgment for theirs, is well settled. Thus when a verdict allows interest, when it exceeds the amount claimed, or in any other case, when that, which ought not to stand, is clearly ascertained, the remittal may be allowed.    But it ought not to be carried so far as to allow the court, when the jury has obviously mistaken the law or the evidence and rendered a verdict, which ought not to stand, to substitute its own judgment for theirs, and after determining upon the evidence what amount ought to be allowed allow the plaintiff to remit the excess, and then refuse a new trial.    There are authorities that would sustain even this, as *Collins* v. *Railroad Co.*, 12 Barb. 492, and *Clapp* v. *Railroad Co.*, 19 Barb. 461.    But we are unable to see how such a practice can be sustained in such cases, as those were, without doing the very thing, which they proposed not to do; that is, allow the court to substitute its own verdict for a

wrong verdict of a jury, and on the plaintiff's accepting that refusing a new trial. The true rule on the subject is stated in *Thomas* v. *Womack*, 13 Tex. 580, and *Lambert* v. *Craig*, 12 Pick. 199. See also *George* v. *Law et al.*, 1 Cal. 363."

As concurring with the view of the Wisconsin Court of Appeals I may refer to *Sloan* v. *New York Central and Hudson River R. R. Co.*, 1 Hun 542. But on the contrary see *Murray* v. *Hudson River R. R. Co.*, 47 Barb. 196. In some States the Courts of Appeals have gone so far as to reverse cases of this description, unless the plaintiff in the court below would accept in lieu of the judgment rendered below an amount apparently fixed arbitrarily by the Court of Appeals, and on his so doing the judgment has been affirmed. See *Sherman* v. *The Western Stage Co.*, 24 Ia. 515 ; *Kinsey* v. *Wallace*, 36 Cal. 481. But these decisions seem to me to be obviously not in accord with the practice both in this State and in Virginia, to avoid most carefully an encroachment by the court on the province of the jury. As touching this subject see *McRae* v. *Woods*, 2 Wash. 80. The court in *Nudd* v. *Wells et. al.*, 11 Wis. 415, above quoted, lays down principles much more in accord with the general views of the courts in Virginia and West Virginia. I am therefore of the opinion, that the circuit court in no suit for a malicious prosecution, if it deemed the damages awarded by the jury were so enormous as to furnish evidence of prejudice, partiality, passion or corruption on the part of the jury, should refuse to grant a new trial, if the plaintiff would remit so much of the verdict, as in the opinion of the court exceeded what was just. If the damages assessed by the jury were so enormous as to furnish such evidence of impropriety on the part of the jury, the defendant is entitled to have the verdict set aside and cannot be compelled in lieu of the verdict of a new and fair jury to accept the judgment of the court ; and if in our judgment the verdict of the jury was so enormous as under the circumstances of this case to furnish evidence of such impropriety, we would set aside both the judgment and verdict and award a new trial. But a careful examination of the case has led us to the conclusion after giving due weight to the opinion of the circuit judge, that this verdict of the jury in this case is not so enormous, as on the principles we have laid down would have justified

the circuit court, or would justify us, in setting aside the verdict, had the circuit court done, what *it* should have done, rendered a judgment for the full amount of the verdict.    But this error of the circuit court cannot be complained of by either party in this Court.    In the language of Judge Moncure in *The James River and Kanawha Co.* v. *Adams,* 17 Gratt. 435, " The plaintiff cannot complain of this, because he was not bound to give the release, which was merely proposed to his election as an alternative to granting the new trial; and *a fortiori* the defendants cannot complain, because it was for their benefit the damages were reduced, and they could, as they are now endeavoring to do, reverse the judgment of the court, if erroneous."

The judgment of the circuit court must therefore be affirmed, unless errors prejudicial to the defendants, the plaintiffs in error, were committed by the circuit court in the instruction, it refused to grant at the request of the defendants, or in the instructions, it granted at the instance of the plaintiff.    And that we may take a comprehensive view of the law of the whole case as presented to the jury by the instructions of the court, we will consider all the instructions asked by either side including those granted at the instance of the defendants.    The first and second instructions granted by the court at the instance of the defendants below were :

"1st. That in order to entitle the plaintiff to recover in this action, he must prove affirmatively to the satisfaction of the jury by a preponderance of evidence, the defendants sued out the warrant against the plaintiff without any reasonable or probable cause therefor, and also that in so doing they were actuated by malice toward the plaintiff, and that unless the want of probable or reasonable cause and malice concurred, at the time said warrant was sued out, the plaintiff cannot recover.

" 2d. That in order to entitle the plaintiff to recover against the defendant, B. S. Compton, the jury must believe from the evidence, that the warrant was sued out by him, or counselled and advised by him, or that he voluntarily participated in the prosecution, and that it was carried on with his countenance and approval, or that he unlawfully entered into a conspiracy with his co-defendant, A. S. Core, to have

said warrant issued without reasonable or probable cause therefor and with malice toward the plaintiff."

These two instructions lay down the law correctly, as it has been hereinbefore stated.

The third of the defendants' instructions, which was granted by the court, was:

"3d. That the jury, in considering the question of malice as well as probable cause, should consider the statement made on oath by the defendant, A. S. Core, to the justice, who issued the warrant, at the time of issuing the same for the plaintiff's arrest, that the information as to the facts, on which said warrant of arrest was based, was derived by said defendant from others, and that if the jury are satisfied, that said defendant, Core, believed such information as to said facts, as he received from other persons, to be true, and that such facts would excite in a reasonable mind the belief, acting on the facts so derived by him, that the plaintiff, Vinal, was guilty of the crime charged in said warrant of arrest, that there was such probable cause for said defendant, Core, causing such warrant to issue, and the plaintiff cannot recover."

This instruction is obviously erroneous according to the views, which we have expressed of what constitutes probable cause. This instruction makes probable cause to depend not upon the actual existing facts, considering only those known to the defendant personally or by information derived from others, as it should, but upon the mere belief of the defendant in the existence of certain facts reported to him, whether they had any actual existence or not. Of course this belief was to be regarded by the jury in determining, whether the defendant was actuated by malice, which he must have been, before the jury could find a verdict against him; but it renders the cause of the prosecution neither more nor less probable; and it should not have been at all considered in determining, whether there was or was not probable cause. The court therefore clearly erred, when it instructed the jury, that this belief of the defendant should have a controlling influence in determining, whether there was or was not probable cause. In truth it was entitled to no consideration or influence in determining this question. It was entitled to influence, but not necessarily a controlling influence with the jury in determin-

ing a very different question, that is, whether the defendant was actuated by malice. But the decision, as to how much influence it was entitled even on that question, should have been left solely to the jury, and would depend largely on all the other facts and other circumstances of the case. The court ought not in any case to instruct the jury as to the weight these or any other circumstances should have with the jury in determining, whether there was or was not malice. This is a question of fact solely for the determination of the jury; and the court would improperly interfere with the province of the jury in telling them, that they should infer malice from or not infer malice from any specified facts. All that the court can do in this matter, is to tell the jury clearly what is malice, and leave it entirely for them to decide on all the facts and circumstances, whether it did or did not exist. Though the instruction of the court was clearly erroneous, yet, as it was given at the instance of the defendants, the plaintiffs in error, and misstated the law in their favor, it was an error not prejudicial to the appellants, and the judgment of the circuit court complained of could not be reversed for this error.

The fourth instruction asked for by the defendants, the plaintiffs in error, and granted by the court was:

"4th. If the jury believe from the evidence, that the defendant, A. S. Core, had information from others of facts and circumstances, which as a prudent and cautious man would lead and did lead him to suspect or believe that the plaintiff, John F. Vinal, was guilty of the larceny as charged in the warrant, then such information and belief constituted probable cause for the issuing of said warrant, although it afterwards appeared and turned out, that the plaintiff was not guilty of the offence as charged in the warrant, and the plaintiff in this action cannot recover."

This instruction was also obviously erroneous and ought not to have been granted by the court for the same reasons, as ought to have caused the rejection of the third instruction. But the plaintiffs in error cannot complain of this error committed at their instance and not prejudicial but beneficial to them.

The fifth instruction granted at the instance of the defendants was:

" 5th. If the.jury believe from the evidence, that prior to suing out said warrant the detendant, Core, gave a full and correct statement of the material facts of the case, as he understood them from others, and which facts the said Core honestly believed to be true, to R. S. Blair, his counsel, and who was also at the time prosecuting attorney for the county of Ritchie, and in suing out said warrant acted upon the advice of said counsel in an honest belief, that he was taking and using such proper means and remedies, as the law provided under the circumstances of the case, then there was not such malice in the use of the warrant (although wrongfully used) as will entitle the plaintiff to recover in this action."

This instruction ought not to have been granted by the court. As we have seen, whether malice did or did not exist in the defendant, is a pure question of fact to be determined by the jury upon a consideration of all the facts and circumstances of the case. The court may tell the jury, what in law is meant by malice, but it ought not to tell them, either that they can or may infer malice from a specified state of facts, or that from any specified state of facts they should find that malice did not exist. This would be interfering with the province of the jury by the court's drawing the inference from certain facts, that malice did or did not exist, which it has no right to do, this being an inference of fact and not of law and therefore to be drawn by the jury and not by the court. Even instructing, that they might draw the inference, that malice did or did not exist from certain specified facts, would tend to mislead the jury by drawing their attention away from other facts not specified, and which ought also to be considered by the jury, and causing them to attach perhaps undue importance to the facts specified in the instruction. In other words, it would be indirectly expressing an opinion of the court as to the weight of the evidence in determining a mere question of fact; and this the court should always carefully avoid.

In this instruction, for instance, there can be no doubt, that the facts and circumstances stated hypothetically in the question, if they existed, would be entitled to great consideration by the jury in determining, whether the defendant, Core, was or was not actuated by malice ; but to tell the jury, that from

9

them they must infer, that the defendant, Core, was not actuated by malice, was error in the court. Even to have called their particular attention to these facts and circumstances stated hypothetically and to have instructed them, that from these circumstances they might infer, that Core, the defendant, was not actuated by malice, would have been wrong in the court, because it would have been directing their attention specially to these facts, and it might be considered by the jury as impliedly telling them, that they were entitled to great or special weight, and indirectly excluding from their consideration other facts, which might on this question be entititled to even more weight with the jury ; as for instance, if the jury believed it to exist, the determined and settled malignity of one of the defendants ; the fact that the attorney who gave the advice may in the opinion of the jury have been influenced in so doing by his pecuniary interest, and the defendant, Core, in seeking his advice knew he was in no position to give a disinterested opinion ; the fact, if believed by the jury, that the defendant, Core, in seeking this advice was obtaining it not from a desire to bring a supposed criminal to justice, but by a desire to recover property, which the accused had in his possession, and which Core, the defendant, claimed ; and other circumstances not necessary to name. But the improper giving of this fifth instruction cannot be complained of by the plaintiffs in error, as it was not prejudicial to them but the reverse, and was given at their instance by the court.

The sixth instruction granted by the court at the instance of the defendants, was as follows :

" 6th. The acquittal by the justice of the plaintiff of the charge in the warrant, is not in this action conclusive evidence of the want of probable cause; and if the jury believe from all the evidence adduced before them, that the facts and circumstances so existed at the time of suing out the warrant created a well-grounded suspicion of the plaintiff's guilt, as charged in the warrant, then the plaintiff is not entitled to recover."

This instruction is substantially correct. It would however have expressed the law more clearly and accurately, if in it the expression " well-grounded belief " instead of " well-grounded suspicion " had been used. It left however to the

jury on the whole evidence the mixed question of law and fact, "whether there was or was not probable cause;" and this was proper, unless either the plaintiff or de-defendants desired the question of law involved in what is probable cause separated from the question of fact also involved in it. This separation would be effected by either party asking the court to instruct, that a hypothetical state of facts, which the evidence tended to prove, if believed by the jury, constituted or did not constitute probable cause.

The seventh and last instruction asked by the defendants was :

"7th. If the jury believe from the evidence that the plaintiff by his own misconduct or by his own folly or fraud exposed himself to well-grounded suspicions of being guilty of the offence charged in the warrant, then that is sufficient to produce probable cause for instituting a prosecution against him for such offence, and which is in itself a sufficient defence in this action."

This instruction for reasons heretofore stated at length was properly refused by the court. If it had stated the law correctly, it is very questionable, whether it ought not to have been refused, because on the evidence now in the record, I hardly think that it can be said, that there was any evidence in the case tending to show, that "the plaintiff by his own misconduct, or by his own folly or fraud exposed himself to well-grounded suspicions of being guilty of the offence charged in the warrant." But if there had been evidence tending to prove fraud on the part of the plaintiff, which I hardly think exists in the record as it is now presented to us, this instruction would for reasons already stated at length have been erroneous and ought to have been, as it was properly, rejected. In such case the only instruction which, could have been properly given, is : "If from the evidence the jury believe, that the plaintiff having possession of said oil, alleged in the warrant to have been stolen by him, knew, that this oil belonged to the West Virginia Oil and Oil Land Company or their assignee, Core, and the plaintiff had no *bona fide* claim thereto, and if from the evidence the jury believe, that so knowing the plaintiff removed this oil without the consent of its owners, and appropriated it to his own use with the fraudulent pur-

pose of getting an undue advantage, then such misconduct on the part of the plaintiff, while it would not justify the defendants in causing him to be arrested for larceny, would render it entirely improper in the jury, if the plaintiff proves his right to recover, to award to him in this case punitive damages, and the compensatory damages, which he may be entitled to recover, must be mitigated or diminished, as a portion of these damages are given for the injury to the plaintiff's character, which character would be affected by such fraudulent conduct, if proven."

The reasons why such an instruction should be given, if there be evidence tending to prove the facts, on which it is based, have been fully stated hereinbefore and need not be repeated.

We conclude therefore, that the granting or refusing to grant any of the defendant's instructions furnishes no grounds, on which the plaintiffs in error can ask of this court to reverse the judgment, which was rendered against them by the circuit court.

It remains for us to consider, whether the court erred in granting any of the instructions asked by the plaintiff below. The first of these instructions was as follows:

" 1st. Probable cause is the existence of such facts and circumstances, as would excite in a reasonable mind the belief, *acting on the facts within the knowledge of the prosecution* or facts derived from others, that the person charged was guilty of the crime for which he was prosecuted; or, as has been expressed in other words: ' Probable cause for instituting a prosecution is held to be such a state of facts *known to and influencing* the prosecutors,' as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably and without prejudice upon the facts within the party's knowledge, to believe, that the person accused is guilty.' "

The first part of this instruction is substantially correct, though it would have been more accurately expressed thus: Probable cause is a state of facts actually existing known to the prosecutors personally or by imformation derived from others, which would justify the prosecution, that is, which in the judgment of the court would lead a reasonable man of ordinary caution acting conscientiously on these facts to believe the party guilty. Our reasons for so defining probable cause

have already been given at great length and need not be 1epeated. The latter part of this first instruction granted by
the court is erroneous and ought not to have been given by
the court. The first part of the instruction properly confined
the facts to be considered in determining, whether probable
·cause existed or did not exist, to those facts known personally
or otherwise to the prosecutors. The second part of the instruction in effect says, that these actual facts known to the
prosecutors are not to be considered in determining, whether
there was or was not probable cause, unless these known facts
*influenced* the prosecutors in setting on foot the prosecution.
We have shown, that if the facts known to the prosecutors
would in the judgment of the court justify a prosecution being set on foot, then probable cause existed, and it is totally
immaterial in considering, whether probable cause existed or
not, to consider, whether the prosecutors were influenced or
not by these facts known to them. Their opinions of these
facts or the influence they had on their conduct is totally immaterial, when we are determining this question : Did or did
not probable cause exist? When the jury is determining,
whether malice in the defendants did or did not exist, obviously the opinions of the defendants as well as all matters,
which either influenced or failed to influence their conduct,
should be considered, but not so when the question is: Was
there probable cause? The giving then of this first instruction
by the court was an error, the first and second parts of it being in conflict really, and taken altogether it was calculated to
confuse the jury. The first part of this instruction only should
have been granted; and even it could have been made somewhat more clear, though it was substantially correct.

The second instruction asked by the plaintiff and granted
by the court was :

" 2d. That if the jury believe from the evidence, that the
plaintiff was arrested on the warrant, on the charge of grand
larceny, was examined on said charge, and after said examination before the justice, as alleged in the declaration, was discharged from prosecution thereon, as alleged, then such discharge is *prima facie* evidence, that there was want of probable
cause for such criminal prosecution sufficient to throw the
burden of the proof on the defendants, of rebutting the

inference, that there was such want of probable cause for charging the plaintiff with the crime set out in the warrant in the declaration mentioned; and if the jury believe from the evidence that there was want of probable cause for charging the plaintiff with said crime, then the jury have the right to infer malice in the defendants in beginning such prosecution."

This instruction states the law correctly and was properly given by the court. We have hereinbefore fully discussed the points involved in this instruction and need not repeat the reasoning, which has induced us to state the law to be as set forth in this instruction.

The third instruction asked by the plaintiff and granted by the court was this:

" 3d. In order for the defendants to rely on the defence to this action, that they were advised by counsel to institute the criminal proceedings against the plaintiff, Vinal, the burden of proof is on them, the defendants, Core and Compton, to show to the satisfaction of the jury, that there were in existence such facts and circumstances, as would excite in reasonable minds the belief, acting on the facts within their knowledge or facts derived from others, that Vinal was guilty of the crime alleged against him in the warrant of arrest, and that they fairly and impartially laid all the facts of the case before their attorneys before beginning proceedings against the plaintiff on the charge alleged; but if the jury from the evidence believe, that the defendants misrepresented the facts and circumstances of the case to their attorney, or that they withheld important facts or circumstances in their knowledge from their attorney, then the advice of their attorney, if any such was given them, to swear out the warrant of arrest for grand larceny against Vinal, as alleged, constitutes no defence to this action."

This instruction ought not to have been given. It amounts to this: " That in order for the defendants to rely on the advice given them by counsel, the burden of proof is on them to show, that they had probable cause for the prosecution, and that they fairly laid all the facts before their attorney and did not misrepresent them to such attorney." This instruction is erroneous; first, because the burden of proving the want of probable cause is not, as we have seen, on the defendants, but

on the plaintiff; and secondly, because it amounts in effect to saying to the jury, that the existence of malice should be inferred from the misrepresentation by the defendants of facts known to them, when they obtained the advice of counsel to institute the prosecution. The court ought not to have given to the jury any instruction liable to be interpreted by them as instructing them, that they must infer malice from any state of facts. Malice is never an inference of law but always an inference of fact, to be inferred by the jury or not, as they deem proper from all the facts and circumstances of the case; and as we have seen, any instruction of the court telling them they might, much more in telling them impliedly that they must, infer malice from certain of the facts, if believed, in proof before them is wrong. The jury, if they find malice to exist, should do so from all the facts and circumstances proved before them; and in reaching this conclusion the court ought not to control or influence them by any instruction excepting one defining to them clearly, what in law is meant by malice, and ought then to leave it to the jury entirely to determine, whether this legal malice did or did not exist. The giving of this instruction was calculated to mislead the jury to the prejudice of the plaintiff in error, and it ought not to have been given.

The fourth instruction asked by the plaintiff and given by the court was:

"4th. That to constitute the crime of larceny, as charged against the plaintiff, Vinal, it must have been shown that Vinal, with a *felonious intent*, did take, steal and carry away the oil in question from the possession of Core or his agents, with intent to convert the said oil to his (Vinal's) own use; and if the jury believe from the evidence, that at the time said oil was removed, if removed, said oil was not in fact in possession or under the control of the said Core or his agents, and that he might by reasonable enquiry or investigation have discovered the truth of the fact as to the possession of said oil and the claim of the said Vinal thereto, then the removing of the said oil by the said Vinal did not constitute larceny, if the same was removed by him; and in this action such removal of said oil did not constitute probable cause for the prosecution of the plaintiff."

This instruction is not exactly correct. It should have been modified and then given to the jury in this form:

"4th. That to constitute the crime of larceny as charged against the plaintiff, Vinal, it must have been shown, that Vinal with a felonious intent did take, steal and carry away the oil in question from the possession of Core or his agents with intent to convert the said oil to his, Vinal's, own use; and if the said oil was not in fact in the possession or under the control of said Core or of his agents, then the removing of said oil by the said Vinal and its conversion to his own use did not constitute larceny; and if the defendants knew, that said oil was not in fact in the possession or under the control of the said Core and his agents, when it was removed by Vinal, then such removal did not constitute probable cause for the prosecution of the plaintiff, and the jury may presume, that the defendants knew, that said oil was not in fact in the possession or under the control of said Core or his agents, when so removed, from the mere existence of this fact, if it be found by the jury to have existed, unless they prove to the satisfaction of the jury, that they did not know this fact."

We have seen, that probable cause depends upon the existing facts known to the prosecutor, and not, as the instruction in effect says, upon existing facts, which might have become known to him by reasonable enquiry or investigation. This want of enquiry or investigation by the prosecutor is a fact, which should be weighed by the jury in determining the question, whether the defendant was actuated by malice; but this want of investigation can not be considered in determining, whether there was or was not probable cause. We have also seen heretofore, that all existing facts are presumed to be known to the prosecutor, unless the contrary was made to appear; and hence the propriety of the concluding sentence in the instruction in the form, in which it should have been given by this court.

The fifth instruction given by the court at the instance of the plaintiff was:

"5th. If the jury believe from the evidence, that the defendants, at the time they laid the case before Robert S. Blair, their attorney, knew, or might, by exercising reasonable enquiry and investigation have known, that the oil in question had

never in fact been in possession of the said Core or the West Virginia Oil and Oil Land Company or of the said Compton, and that Vinal caused said oil to be removed from his tank or from his premises under a claim of right by said Vinal, but on the contrary thereof informed their said attorney, that said oil had been delivered to said Core, and that the said Vinal had taken the said oil out of the possession of said Core, and if the jury believe from the evidence that such statement as to Vinal's taking said oil out of Core's possession was false, if so made as aforesaid, and that the said defendants then and there knew, when it was made, that it was false, or by such reasonable enqury and investigation might have known it was false and unfounded, then the advice of counsel given on such statement affords no defence to this action."

This instruction is in effect that advice of counsel given the prosecutors under the circumstances set forth in the instruction constitutes no defence to this action, as it is the equivalent of saying, that under the facts and circumstances stated in the bill of exception malice should be inferred despite the advice of counsel. Now it is very true, that under the circumstances set forth in this instruction, I presume, any jury as a matter of fact would infer malice, unless there were other very strong facts and circumstances to rebut such an inference and assumption; but this inference is, as we have repeatedly said, an inference of fact to be drawn by the jury, and not an inference of law to be drawn by the court. No instruction should ever be given by the court, as to whether the jury might or ought to infer malice from the proof of any specified facts or circumstances. It should be left to the jury to draw its own inference of fact and say, whether malice did or did not exist, uninfluenced by the court, who on this point should only instruct them clearly, as to what is meant by malice in its legal signification. This instruction ought therefore to have been refused; and the court erred to the prejudice of the plaintiffs in error in granting this instruction.

The sixth and last instruction given by the court to the jury at the instance of the plaintiff was:

"6th. If the jury believe from the evidence that said criminal prosecution was set on foot for the purpose of recovering possession of the oil in question, and not for the purpose

of aiding in the conviction of said Vinal for a crime, of which they had reasonable or probable cause to believe him guilty, then the jury have the right to find, that the defendants had no probable cause for the criminal prosecution of the plaintiff."

We have seen, that all the authorities agree, that while malice may be inferred from a want of probable cause by a jury, that a want of probable cause can never be inferred from the most positive proof of the most express malice. This instruction is obviously in conflict with all these authorities and ought not to have been given. The granting of it was prejudicial to the defendants, the plaintiffs in error, and it is such an error as would by itself compel a reversal of the judgment of the circuit court in this case.

In lieu of the instructions of the plaintiff, which ought to have been rejected by the court, it should have given an instruction to the jury clearly defining, what is the legal meaning of malice; this instruction should have been:

Whether the defendants have been actuated by malice is a question of fact to be determined by the jury only; and in determining it they should consider all the facts and circumstances in the case, and unless they find the defendants were actuated by malice, they cannot find a verdict against them. But by malice is not meant merely malignity or ill-will, but it includes every sinister or improper motive, that is, every motive other than a desire to bring to punishment a party believed to be guilty of a crime. If for instance in this case the defendants were in whole or in part actuated by a desire to obtain possession of the oil, alleged to have been stolen, they must in law be held to have been actuated by malice.

As we have seen, if a person instigates a prosecution against another, basing his action on certain facts known to him, and the court considers, that on these facts a reasonable man of ordinary caution acting conscientiously would believe the party guilty of the crime charged, then his conduct was based on probable cause, and he is fully justified by law, I care not how malignant he may be, or by what improper motives he may have been actuated. But if on the contrary he has instigated the prosecution without probable cause based on the actual facts known to him either personally or from the information

of others, he will be held responsible, unless he is excused by a jury being satisfied, that he was actuated *only* by a desire to bring to justice one believed to be guilty of a crime; and when there was no probable cause, he cannot be excused, if in instigating the prosecution he was actuated either in *whole or in part* by any other motive than the public good. This is substantially expressed in the instruction, which should have been given in lieu of those rejected.

For the reasons we have assigned the judgment of the circuit court of Wood county rendered on the 19th day of April, 1879, must be set aside, reversed and annulled, and the plaintiffs in error must recover of the defendant in error their costs about this case in this court expended; and the verdict of the jury rendered in this case must be set aside, and a new trial awarded, the costs of the former trial to abide the final decision of this case; and this case is remanded to the circuit court of Wood county to be further proceeded in according to the principles laid down in this opinion and further according to law.

JUDGES HAYMOND AND MOORE CONCURRED.

JUDGMENT REVERSED.   CAUSE REMANDED.